J. A. DIBEL, Executor, Appellant, v. L. K. MEREDITH, Appellee.

No. 46205.

JUNE 15, 1943.

Luther M. Carr, of Newton, and Putnam, Putnam, Fillmore & Putnam, of Des Moines, for appellant.

Royal & Royal, of Des Moines, for appellee.

MANTZ, J.—Preliminary to a consideration of the various questions involved in this appeal, we believe it will be helpful to briefly set forth some of the salient facts and events leading up to the bringing of the action herein.

Sadie A. Carter, at times spoken of as Mrs. Morgan Carter, died on August 27, 1941, at Des Moines, Iowa, at the home of her

nephew, L. K. Meredith, defendant herein. Her husband, Morgan Carter, a resident of Jasper County, Iowa, died in 1935. She was childless. She and her husband had lived in Jasper county for many years, the more recent being in the town of Monroe in that county. She was a resident of that county at her death, and her estate was there opened and is still pending.

She made a will on November 10, 1939, and a codicil on March 25, 1941, both being drawn by Luther M. Carr, an attorney of Newton, Iowa. Mr. Carr had previously advised her on various legal matters. The will and codicil were probated on October 5, 1941, and J. A. Dibel, of Monroe, Iowa, a long-time friend of Mrs. Carter and her husband, was appointed executor. He is the plaintiff in this action and Mr. Carr is his attorney as such executor. At the time she lived in Monroe and at her death Mrs. Carter owned a 122-acre farm near that place. At the time she made her will she owned a dwelling, her homestead, in Monroe. At her death she had money in two of the Newton banks and in one bank in Monroe. Under the will the farm was given to an elder sister, Emma Meredith, mother of L. K. Meredith, for life, and the remainder to L. K. Meredith and a brother. They were also given personal belongings and household furniture. All other property, including cash in the banks and the homestead in Monroe, was given to two nieces and two nephews, all nonresidents, share and share alike.

Emma Meredith died in January 1941. Mrs. Carter had lived with her about a year prior to her death. Following the death of Emma, Mrs. Carter lived with L. K. Meredith until about June 1, 1941, when she returned to her old home at Monroe, boarding and living there with old friends. On August 7, 1941, she suffered a stroke of apoplexy and the defendant and his wife took her to their home in Des Moines, where she remained until her death three weeks later.

In December 1939 the homestead in Monroe was sold and settlement was made in January following. The proceeds, together with a small additional amount, were taken by Mrs. Carter to Des Moines and were there deposited in her savings account in the Bankers Trust Company of Des Moines, and on May 21, 1941, there was in that account the sum of $2,539.56.

Following the death of Mrs. Carter, plaintiff sought to learn the whereabouts or disposition of this sum, and upon inquiry he learned .that such amount, with the exception of $5, had been withdrawn from the bank on May 21, 1941, by L. K. Meredith upon withdrawal slips signed by Mrs. Carter. Plaintiff, in company with L. K. Meredith, went to Newton the following day to make arrangements for the funeral, and while there, and in the presence of Attorney Carr, Meredith said he was afraid that they would find the $2,500 missing from the Des Moines bank. He expressed ignorance as to its whereabouts. Shortly thereafter, and on several occasions, plaintiff and his attorney contacted defendant to make inquiry as to what had become of the funds withdrawn. On one occasion, Mrs. Meredith was present. They expressed ignorance as to its whereabouts, and Dr. Meredith suggested the names of four or five persons who might have gotten it from Mrs. Carter. Being unable to get any satisfactory explanation from Meredith, plaintiff brought this action. Following this and on December 23, 1941, plaintiff brought this action in equity for discovery and accounting under the statute and alleged that this money had been ·deposited in the bank in the name of Sadie A. Carter and that L. K. Meredith had secured possession of it and refused to pay it over to the executor, prayed that there be an accounting and that defendant be required to pay over to the executor the sum of $2,534.56, and prayed for judgment for said amount against the defendant, and for costs and general equitable relief.

On February 24, 1942, the defendant filed what, in effect, was a general denial of the claims made by plaintiff, but admitted that Sadie A. Carter had died on August 27, 1941, and that certain exhibits attached to the pleadings bore the true signature of Mrs. Sadie A. Carter. He prayed that the petition of plaintiff be dismissed. The cause was tried in equity in May 1942, and on June 2, 1942, the lower court dismissed the petition of plaintiff on its merits and taxed the costs equally. The plaintiff has appealed.

In brief, appellant alleges that L. K. Meredith, a nephew of. Mrs. Carter's, induced her to dispose of her home in Monroe and move to Des Moines; that he arranged for, directed, and managed

the deposit of the proceeds of the sale of the property in the Bankers Trust Company and that later and without her knowledge, by means of withdrawal slips signed by her in blank, he withdrew from her account in said bank a sum in excess of $2,500, and that at the time the suit was brought he had possession of it and refused to turn it over to the executor of the estate as property belonging thereto.

Appellant makes the claim that, by reason of the situation and the relationship of the parties and the dealings between Mrs. Carter and L. K. Meredith, a confidential relationship arose and existed between appellee and Mrs. Carter and that by reason thereof the appellee obtained possession of the funds on deposit in the bank.

We will first take up and consider the claim of appellant that there existed a confidential relationship between Mrs. Carter and L. K. Meredith. We think that a fair consideration of the evidence, together with legitimate inferences arising therefrom, sustains this claim. We think that appellant has established such claim. Before reviewing the facts which we feel point to that conclusion it will be well to call attention to some of the legal principles involved.

Confidential relationship is a very broad term and is not at all confined to any specific association of the parties to it. In law it has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation, the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.

A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation." 15 C. J. S. 822. Pomeroy's Equity Jurisprudence, 3d Ed., section 956, gives the above as being the true principle. In the discussion the author cites the holding of Turner, L. J., in Rhodes v. Bate, [1866] L. R. 1 Ch. 252, 257, as follows:

"* * * I take it to be a well-established principle of this Court, that persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the Court that the persons by whom the benefits have been conferred had competent and independent advice in conferring them."

In Billage v. Southee, 9 Hare 534, 540, it was said:

"The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatever may be the nature of the confidence reposed, or the relation of the parties between whom it has subsisted. I take the principle to be one of universal application * * *."

Following the above citation the author states that it is the rule that in all instances where two parties in a confidential relation consciously and intentionally deal and negotiate with each other, each knowingly taking part in a transaction, and there results from their dealing some conveyance, contract, or gift, the principle literally and directly applies. The transaction is not necessarily voidable; it may be valid, but a presumption of its invalidity arises which can be overcome only, if at all, by clear evidence of good faith, or full knowledge, and of independent consent and action.

For a full and comprehensive discussion of this principle, see the case of Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873. The holding of the court therein as to the application of the rules as to confidential relations has been adhered to by a continuous line of decisions of this court. In the late case of Sinco v. Kirkwood, 228 Iowa 1020, 1030, 291 N. W. 873, 878, Justice Hale, speaking on that subject, used the following language:

"It is true that in an action to set aside a deed, under ordinary conditions, the burden is upon the plaintiff, *except where confidential or fiduciary relations are established,* in which case it is incumbent upon the person claiming under the

deed to establish the bona fides of the transaction." (Italics supplied.)

In support of this principle, see Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353; Merritt v. Easterly, 226 Iowa 514, 284 N. W. 397. In the last-cited case, Justice Bliss made a thorough review of the holdings on the subject, pointing out therein the distinction between the terms "fiduciary relationship" and "confidential relationship."

It was the holding in the cited case, based upon authority, that a confidential relationship arises where one person gains the confidence of another and purports to act and advise with the other's interest in mind.

The force of the holding is that where one person stands in a confidential relationship to another he will not be permitted to retain advantages of a transaction with the other person when they may reasonably be the result of confidence reposed, unless he shows that the other party acted with freedom, intelligence, and full knowledge of the facts, and had an opportunity to secure competent and impartial advice from some person other than the donee. In passing upon such transactions, courts of equity will scrutinize with jealous vigilance, and in the end will require the dominating party to a confidential relationship to conduct himself in his dealings with the other with the utmost good faith. It was likewise held that the donor was entitled to have independent advice. "Independent advice" in this connection means the showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect but who was furthermore so disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidentially as to the consequences to himself and of his proposed benefaction. Post v. Hagan, 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997.

With these principles in mind, let us examine the record. While so doing we should not lose sight of the fact that it was something like nine months following the death of Mrs. Carter that the appellee first urged in court that the money

received from Mrs. Carter was in the nature of a gift. Prior to that time he and his wife had consistently expressed ignorance of its disposition following its withdrawal from the bank by L. K. Meredith.

For many years Mrs. Carter had lived in Monroe, Iowa, where she owned a home. She was then past eighty-five years of age, was crippled physically and was in failing health. This made it difficult for her to get about by herself. Appellee, her nephew, was fifty-one years of age. The evidence shows that he gained her confidence and purported to advise with her with her interests in mind. He advised with her and urged her to sell the homestead in Monroe and to come and live in Des Moines. He suggested to appellant, an old friend of hers, that he urge her to sell the property and make the move. She sold the house, obtained the proceeds thereof, and came to Des Moines and lived for a time with her sister, mother of appellee. She brought with her the proceeds of the sale of the house and, at the suggestion of appellee, deposited them in a bank in Des Moines where appellee did business. Prior to that time she had never done business at any Des Moines bank and did her banking business with other banks. She then had deposits in Newton and Monroe banks. Meredith arranged for the depository and also a safe-deposit box therein, and the record shows that he had full access to it at all times and on several occasions availed himself of such privilege. He had charge of all of her business at that bank, making all the deposits and withdrawals. Mrs. Carter was never in the Des Moines bank.

When her sister died in January 1941, Mrs. Carter at once went to the Meredith home and lived there until about Decoration Day. She was not satisfied and expressed a desire to return to her old home at Monroe and buy herself a home in order to be with her old friends and neighbors. Appellee did not want her to buy a home and urged her not to do so, and suggested to appellant that he (appellant) urge her not to do so. When Mrs. Carter wanted to go back to Monroe about the middle of May, appellee urged her to stay until Decoration Day, when he planned to drive to Ottumwa and would take her to Monroe. (The money was withdrawn from the Des Moines bank on May

21st.) Mrs. Carter had the utmost confidence in appellee and he testified that she had implicit faith in him. Throughout this period appellee was Mrs. Carter's physician. He had also been physician for her deceased husband.

With this record we have no hesitation in holding that during this period there existed a confidential relationship between Mrs. Carter and L. K. Meredith, appellee herein.

Such relationship being shown to exist, the burden was upon the appellee to show the good faith and fair dealing of the whole transaction. The record herein shows that he has not sustained that burden.

He claims that the money withdrawn from the bank was given to his wife, Mrs. L. K. Meredith. To establish this claim he relies upon the testimony of his wife in addition to that which he gives. He makes no showing that Mrs. Carter had the opportunity or advantage of independent and impartial advice in her dealings. Whatever she did was upon his advice and suggestion. From the time Mrs. Carter entered the Meredith home in January 1941, until she left on Decoration Day, she was there all the time. She was with Meredith and his wife at all times. When she went anywhere, they took her.

On May 21, 1941, Mrs. Carter had on deposit in her savings account in the Bankers Trust Company of Des Moines $2,539.56, practically all of which represented the proceeds of the sale of the homestead at Monroe. This fact was well known to appellee. He had made the deposit and had access to her account and safety box. There is evidence in the record that appellee knew the terms of the will of Mrs. Carter before May 21, 1941. A copy of her will was found among her papers after her death. Before Mrs. Carter sold her home in Monroe appellee stated to appellant that he, appellee, and his brother were to get the farm in Jasper county and that the other relatives were to get the personal property, including the Monroe homestead.

Appellant, in trying to locate the missing funds, had the bank records examined, and the records of May 21, 1941, showed that on that date L. K. Meredith had made two withdrawals from the savings account of Mrs. Carter. The bank paid these out on certain withdrawal slips bearing the signature of Mrs.

Carter. The other writing thereon was in the handwriting of L. K. Meredith. One withdrawal was for $2,500 and was paid in $100 bills. The other was in the amount of $34.56. When appellant advised appellee about the bank records, the appellee stated that he had withdrawn the money at the request of Mrs. Carter and had turned it over to her and he expressed ignorance as to what had become of it.

The record shows that there was evidence to the effect that, upon the request of L. K. Meredith, Mrs. Carter ·signed withdrawal slips in blank. Meredith denied such evidence but we are of the opinion that at least some of such withdrawal slips were so handled.

It is rather significant that the first time the appellee made the claim that he had withdrawn the money from the bank at the request of Mrs. Carter and that she had given it to Mrs. Meredith was after the trial of the case had started and after the bank statements of Meredith and his wife had been produced in court. Prior to that time neither of them had made the claim that the money withdrawn had been given by Mrs. Carter to Mrs. Meredith and that the latter had given ·it to· appellee to be deposited in their various accounts as appellee saw fit.

The bank records of May 21st reveal some rather peculiar circumstances connected with the withdrawals and deposits. They show that on May 21, 1941, appellee withdrew $2,500 in $100 bills on one withdrawal slip from one teller, $34.56 on another withdrawal slip from another teller, and on the same visit deposited $100 in currency in his own account, doing business with another teller. He states that he made but one visit to the bank that day.

Appellee claims that he took the withdrawn money home and gave it to Mrs. Carter, and that later this was given by Mrs. Carter to his wife, and that on May 29th his wife gave it to him to deposit. His claim that this money was given to his wife bears close scrutiny. The wife testified that she turned over the $2,500 in currency to appellee on May 29th. Decoration Day, the day following, Meredith and his wife drove to Ottumwa. Instead of depositing this $2,500 in currency on that day, as an honest and prudent person would have done, ap-

pellee deposited $300 in cash in his account and $600 in cash in the account of his wife, the total of the two deposits being $405 and $610 respectively. On June 3d appellee claims to have deposited another $1,000 in cash in his account (the total deposit being $1,027) and to have deposited the remaining $400 in his wife's account on June 3d (the total amount of the deposit being $405). According to the testimony of appellee, $2,300 of the $2,500 given to him in cash was deposited in four different amounts in two different accounts and on two different dates. We find no adequate explanation of such unusual conduct. Mrs. Meredith, as a witness, stated, "I don't know why he divided the amounts in the different accounts the way he did." Asked why he used two withdrawal slips on May 21st, appellee testified, "I haven't been able to remember why I used two withdrawal slips on the same day, May 21, except she may have requested it, I don't know."

Then we have the admitted fact that Meredith did not tell the executor and his attorney the truth when he claimed he had no knowledge of where the money had gone. Dibel testified, and appellee practically admits, after a lot of equivocation, that appellee gave Dibel and his attorney the names of several people who might have gotten the money from the old lady.

Considerable light is thrown upon the character of the appellee by the fact that three days after the estate of Mrs. Carter was opened at Newton he went there in person and filed a claim for $701, for caring for Mrs. Carter during the last twenty days of her life and for medical services during that period and for the services of his wife for looking after her during the same period, each making a charge of $5 per day. Also included therein was a claim for services rendered Mrs. Carter's deceased husband some five years before. When asked why he had not sooner collected this claim, appellee stated that he had an oral agreement with Mrs. Carter that the claim for his services for her husband were not to be paid until her death. As a sidelight on the claim which Meredith and his wife made for the care and keep of Mrs. Carter during the last weeks of her life, the explanation given by Mrs. Meredith is interesting:

"*We* decided to take the money because there was no one

else to take care of Aunt Sade and we were going to have to do it anyway and because it would please her for *us* to have the money.''

Appellee testified, ''she was giving the money to Mrs. Meredith inasmuch as she was going to take care of her and have the work to do.''

There is nothing in the record to show or indicate that after May 21st Mrs. Carter had any idea or notion that the money had been withdrawn from the Des Moines bank. The record shows that Mrs. Carter told Dibel on July 17th that she had her money in the Des Moines bank with which she could buy a home. A letter written to a relative by Mrs. Carter on June 27, 1941, indicates, inferentially at least, that she had not knowingly disposed of her money in the Des Moines bank. We think that such evidence is competent as showing her state of mind or belief.

The evidence shows that Mrs. Carter was a woman of frugal habits, had been an industrious person, was scrupulously honest, and was not in the habit of going into debt.

The bank records show that L. K. Meredith got the money from the bank and the form in which it was obtained. He took it away with him and testified that he took it home with him. Mrs. Meredith testified that he brought it home and gave it to Mrs. Carter. Objection was made to her competency under section 11257, commonly referred to as the ''dead man'' statute. We think that the objection was good, and that she was incompetent to testify as to the transaction. We think that the record affirmatively shows that she took part in the transaction. It seems to us that what happened to this money from the time L. K. Meredith drew it from the bank until it was later redeposited, on staggered dates and in different accounts, may be treated as one continuous transaction. We do not think that it can be chopped up in parcels so as to make the participants therein competent to testify. L. K. Meredith testified he got the money from the bank. The bank records show that he did so. According to Mrs. Meredith, he brought it home and in her presence gave it to Mrs. Carter, and she claims that she took no part in the transaction. She testified:

"It was just about dinner time. He said 'Here is your money, Aunt Sadie.' We kind of laughed about it between ourselves because it was an enormous amount of money, and we didn't know what she was going to do with it at that time. *We* said nothing to her about what to do with her money."

Certainly, the statement of L. K. Meredith that he gave the money to Mrs. Carter was from an incompetent witness. Under the statute we think that Mrs. Meredith was likewise incompetent. Mrs. Meredith also testified that the following day, when she and Mrs. Carter were alone, the latter gave her the money. Shortly thereafter, when Meredith, his wife, and Mrs. Carter were present, Meredith was advised by the others that a gift had been made of the money to Mrs. Meredith. He claims to have taken no part, but we think the record, inferentially at least, shows otherwise. Both Meredith and his wife testified that it was then and there agreed that the matter of the gift was to remain a secret between the Merediths and Mrs. Carter. This pledge of secrecy is given by Meredith as the reason for their failure to advise the appellant and his attorney as to the disposition when they were seeking to locate it following the death of Mrs. Carter. To give credit to this explanation imposes quite a strain upon the credulity of one standing disinterested.

The whole pattern of the evidence given by the Merediths impresses us as showing a rather studied effort to obviate the objection to their competency in the transaction.

Laying aside the question of the competency of L. K. Meredith or of his wife to testify as to the circumstances and incidents in connection with the alleged gift, we have before us the question of their credibility and how much weight is to be given to their testimony. The fact that some of their testimony stands undisputed and uncontradicted does not require a court of equity to accept it as a verity. This is especially true where there is much in the record tending to impeach and contradict them and their testimony. When the appellant, in pursuance of an official duty, was seeking to locate the missing funds and made proper inquiry of them, we think that it became their duty to speak the truth, and their failure to do so, coupled with false and misleading suggestions and information that other

persons may have gotten it from Mrs. Carter, cannot fail to weaken and discredit them as witnesses.

Confronted with this record, a finding in favor of the appellee works a manifest injustice and is not in keeping with fair dealing and equity. The record impresses us as showing a studied attempt and purpose on the part of appellee and his wife to secure possession of the money withdrawn from the bank on May 21, 1941. Knowing the disposition which Mrs. Carter had made in her will of the homestead and her cash on hand, appellee induced Mrs. Carter to change the form of the property from a home into money and to get it in a place where he could secure possession of it. That he had this in view and sought to cover up his tracks in so doing is best shown by the manner of the withdrawal and its redeposit sometime thereafter. If his intentions were fair and candid, why delay in the redeposit of such a large sum of currency and then deposit same in different accounts and on different dates? Their attempted explanation of the transaction does not ring true or smack of sincerity. Their conduct does not harmonize with their words.

This is a court of equity and the case is triable de novo. It is hardly necessary to say that equity looks behind the form and seeks the substance, and we here find a fertile field for the application of that most wholesome principle. We take the whole record and consider it with the view of arriving at a conclusion which will be just and equitable. The lower court must have based its finding largely upon the evidence of appellee and his wife. Our conclusion is that their testimony, bristling with contradictions, inconsistencies, absurdities, false and untrue statements, showing unusual actions and avaricious leanings, cannot and should not be made the basis of a finding whereby other worthy recipients are denied what is justly theirs. To permit appellee and his wife to retain the money withdrawn and to secure the payment of the claim means that the old-time friend and neighbor, J. A. Dibel, would not receive pay for the services which the record shows that he generously rendered for Mrs. Carter, for the payment of which she showed such concern. This was shown by the codicil which she made to her will.

We hold that the record shows a confidential relationship

existed between Mrs. Carter and L. K. Meredith at the time the latter secured the money from the bank. We further hold that L. K. Meredith has not met the burden cast upon him to show the bona fides of the transaction of the alleged gift to his wife. Having so failed, he cannot prevail herein.

Our conclusion is that the lower court erred in finding in favor of the appellee and in dismissing the petition of the executor. Its decree is reversed and the cause remanded with directions that L. K. Meredith be ordered to account to the executor of the Sadie A. Carter estate for the sum of $2,534.56 and that the executor have judgment for said amount against the said L. K. Meredith, together with all costs.—Reversed and remanded with instructions.

GARFIELD, C. J., and MULRONEY, BLISS, and HALE, JJ., concur.

SMITH, J., dissents.

MILLER, OLIVER, and WENNERSTRUM, JJ., take no part.