SCHWARTZLE et al., Appellants, v. DALE, Respondent

(54 N. W:2d 361)

(File No. 9248. Opinion filed July 22, 1952)

Rehearing denied September 19, 1952

**A. J. Beck, Oden & Mead,** Elk Point, for Appellants.
**Donley & Crill** and **Owen J. Donley,** Elk Point, for Respondent.

SMITH, J. Predicated upon the repudiation of an alleged parol agreement to hold described real property in trust for plaintiffs' predecessors in interest, the complaint prays for restitution. The trial court found that defendant verbally agreed to hold the property in trust but concluded that (a) the alleged cause of action was barred by certain final decrees in probate, and (b) the plaintiffs are estopped by laches to assert their cause of action, and (c) the defendant holds title by adverse possession and payment of taxes during ten years. The appeal is from a judgment for defendant.

By way of background it should be stated that the 160 acre Union county farm which defendant agreed to hold in trust was owned by his father, Elling O. Dale. The father died testate in 1926 survived by his widow, Inger Dale, three sons, Leonard, Gerhard and William, defendant above named, two daughters, Agnes and Ida, and two grandchildren, Myrtle Twedt and Johannes Larson, children of a deceased daughter. The will provided for a life esate in all of the testator's property in his widow, and devised the farm in remainder in undivided shares to his children charged with bequest of $500 to Myrtle Twedt and Johannes Larson, respectively. Eighty acres of the land was then mortgaged for the principal sum of $3,000. Among the assets were included two promissory notes of defendant William Dale in the aggregate principal sum of $2,762.77. The trial court found that the $3,000 mortgage, to the extent indicated by his promissory notes, represented funds borrowed to loan to defendant.

The parol agreement on which this action is predicated was made on May 10, 1934. By that time the widow, Inger, and the son Gerhard had died, and the defendant William had qualified as administrator with will annexed of the estate of his father, Elling Dale, and as administrator of Gerhard's estate. Gerhard never had married and died intestate without issue. An Elk Point attorney, since deceased, had been employed by William to probate these estates. At the request of that attorney all of the interested parties, except Leonard, assembled at his office in Elk Point May 10, 1934. William said very little, but in his presence his attorney represented that the estates were heavily involved; that the foreclosure of the mortgage was threatened; and suggested that to save the property, title should be placed in one individual who could make a new loan, pay off the claims, taxes, and the mortgage, and close the estates. The court found that the attorney failed to explain certain matters in making these representations, such as the fact that the estate included the above described promissory notes of defendant which he had failed to list in his inventory, and that the mortgage covered only 80 acres of the land. Induced by these representations the land was conveyed to William by

a warranty deed. We quote the eleventh finding of the trial court.

"That said Ida M. Dale, Agnes I. Schwartzle, Leonard Dale, Myrtle I. Twedt and Johannes E. Larson, relying on the conclusions the defendant induced, on his recommendations for the protection of their interests in the estate property and on his oral agreement that he upon a transfer from them of apparent record title would arrange for necessary refinancing, pay off all of said claims and demands, close the estates and hold such title for the use and benefit of all of them according to their respective interests in the property, did, on May 10, 1934, by warranty deed (Exhibit 1) transfer and convey such title to him."

The farm in question was the family home of the Dales. At the time the agreement was made in May 1934, Leonard, who was in very poor health, Ida, Agnes, two of Agnes' children, and William were living in the home. Leonard and Ida had continued to live there after the death of their father and mother. Agnes, whose married name was Schwartzle, had returned to live there with two of her boys after the death of her husband in 1933, and on the death of Gerhard in 1933, William returned to the family home without his wife. William's sisters and his brother were depending upon him to look after their interests in the estate. After the land was conveyed they continued on as before until the deaths of Agnes and Leonard in 1936 and of Ida in 1942. Agnes' boys did not live on the farm after her death except one of the boys was there in 1939. Williams' wife came to live on the farm in 1936.

After the conveyance William mortgaged the entire quarter for $5,500. The proceeds, except for a small balance retained by William, were used to pay off all of the claims against both estates, the taxes, the amount due on the original mortgage, and the expenses of administration. The checks which made these payments were signed by William and his attorney as "trustees". William harvested the 1933 crop Gerhard had planted and farmed the land in 1934 and 1935. Thereafter the land was leased for a share rent to a neighbor. William has never accounted for any income. He gave his sisters some money for their needs, and there

is some evidence to indicate that he provided for those who lived in the home. In 1940 or 1941 for the first time one of the plaintiffs attempted to talk with William about an accounting but gained no satisfaction. After the death of his sister Ida in 1942, William was the sole survivor of the original family. Within a few months, without consulting Mrs. Twedt, or Johannes Larson, or any of the other successors to the interests of his brothers and sisters, William sold the south 80 acres for $75 per acre and used $4,500 of the proceeds to apply on the above described $5,500 mortgage. This action was commenced in December 1947. The amended complaint prays for an accounting and for restitution of the remaining 80 acres. Except for William, the defendant, the plaintiffs include all of the successors in interest of Gerhard, Leonard, Agnes and Ida.

■■ We need not reproduce that which has been so recently written with reference to the constructive trust as a remedial device of equity. Cf. In re Farmers State Bank of Amherst 67 S. D. 51, 289 N.W. 75, 126 A.L.R. 619. It is settled doctrine in this jurisdiction that one who has received a conveyance of real property, induced by a confidential relationship, and in consideration of a parol promise to hold the property in trust, will be converted into such a constructive trustee if he unjustly repudiates his promise. Jaeger v. Sechser, 65 S. D. 38, 270 N.W. 531. The attempted unjust enrichment should be prevented whether the intention to abuse the confidence of the grantor existed at the time of the conveyance or was subsequently conceived. Scott on Trusts, § 44.2; Professor George P. Costigan, Jr., 12 Mich. L.Rev. 515. Such a confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. Scott on Trusts, § 2.5. Cf. Steinberger v. Steinberger, 60 Cal.App.2d 116, 140 P.2d 31.

It is evident from the findings that the trial court deemed the foregoing principles to be invoked by the facts, and that he looked upon defendant as a constructive trustee, but that he failed to grant restitution for the reasons we are about to consider. In passing we observe that there is ade-

quate support in the evidence for a decree converting defendant into a constructive trustee.

The trial court concluded "That the Final Decree in the estates of Elling O. Dale and Gerhard L. Dale, deceased, are conclusive of the rights of the plaintiffs and the defendant, and that the plaintiffs are barred from asserting any right, title or interest in said premises or in the rents, income, profits or proceeds from said land or the sale thereof." This conclusion was based on a finding that after hearing on notice to Myrtle Twedt, Johannes Larson and to the predecessors in interest of the plaintiffs, the county court entered its final decrees in said estates by which it distributed the property in question "To William W. Dale * * * as his absolute property forever in fee." In so concluding, we think the trial court erred.

In conducting these proceedings in probate, defendant was carrying out the plan he had outlined, and the promise he had made when he induced his grantors to make their conveyance. The decree of the county court confirmed that title; it did not create a new title. Because he has repudiated his promise he is bound to restore that title to his grantors, and equity will not hear him say that while he was purporting to act in their behalf he procured a judgment which cut off their right to restitution. A court of equity will not permit him to so abuse the confidence his grantors have reposed in him. For these reasons we deem the decree to be without significance in this litigation. Our holding could be placed upon another ground.

In dealing with an identical situation, the California court held that the cause of action, which arose out of the parol promise and its repudiation, was not before the probate court, and therefore it was not barred by the final decree of that court. Parr v. Reyman, 215 Cal. 616, 12 P.2d 440. Cf. Airola v. Gorham, 56 Cal.App. 2d 42, 133 P.2d 78.

The trial court concluded the plaintiffs were estopped by laches to claim their rights. In Shearer v. Hutterische Bruder Gemeinde, 28 S. D. 509, 513, 134 N.W. 63, 65, it was written:

"Laches is not, like limitation, a mere matter of time, but principally a question of the inequity in permitting the

claim to be enforced, and inequity founded upon some change in the conditions, or the relations of the property or the parties. 'Laches,' in legal significance is not mere delay, but delay that works a disadvantage to another. So long as persons are in the same condition, it matters little whether one presses a right promptly or slowly within the limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other person has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes, but when a court sees negligence on one side, and injury therefrom on the other, it is a ground for denial of relief. What would be laches in one case might not constitute such in another. The question is one addressed to the sound discretion of the court, depending upon all the facts of the particular case."

The foregoing formulation of the doctrine of laches is generally accepted. Pomeroy's Equity Jurisprudence (5th Ed.) § 419d.

The facts which the court found as the basis of its conclusion that the plaintiffs are estopped because of their laches may be briefly summarized as follows. Defendant has been in possession of the property since 1936; he has received and appropriated all the rents, profits and income; no demand was made on him for the property or a share of the income until shortly before this action was commenced in 1947; he has paid all the taxes, interest on the mortgage, and all but $500 of the principal amount thereof; he made some repairs and improvement including R.E.A. power and light; the property has increased in value; and the delay of plaintiffs in asserting their rights is inexcusable. To these findings counsel, in argument, adds the undisputed fact that the lawyer who handled the original transaction and the probate died in 1936.

In considering whether there was inexcusable delay in asserting plaintiffs' rights, and if so, whether there was a change of condition during such delay, we look at facts re-

vealed by undisputed testimony and by other findings of the court.

As we have indicated, defendant returned to this home farm in 1933 after the death of his brother Gerhard. He took up residence there with his brother Leonard, a semi-invalid, and his maiden sister Ida. Soon the widowed sister Agnes, and two of her boys, joined the circle. The conveyance made under the circumstances above described did not occur until 1934. They all continued to live there as before, after the conveyance had been made. Leonard and Agnes died in 1936, but Ida did not die until 1942. The testimony of the defendant includes these questions and answers:

"Q. And it was also the home of your sister Ida, was it not? A. Yes, sir.

"Q. And she used that as her home until she died, and she died in 1942. A. Yes."

The improvements which defendant made were not substantial. The house was shingled, an old barn was torn down, and the old and some new material were used in building a chicken house, and the R.E.A. electric service was installed. The funds received from rents and profits, the $5,500 mortgage, and the sale of the south 80 acres were sufficient to more than discharge the payments he made on taxes, interest and principal, and for improvements. There is no evidence of conduct prior to 1940 which indicated that defendant was repudiating his agreement to hold this property for the family. That there may have been some suspicion in the minds of the interested parties in 1940 or 1941, that their confidence had been misplaced is indicated by the fact that some of them made inquiry about an accounting. Those suspicions were confirmed in 1942 when he sold the 80 acres without consulting anybody.

When the conduct of the defendant is viewed in the light of the finding that he agreed to hold the title to this property for the benefit of the members of his family, it becomes difficult to determine exactly when plaintiffs were required to assert their rights, Cf. Scott on Trusts, § 481.1. If it be assumed however that there was inexcusable delay in the premises, the crucial inquiry remains, viz., what change

has intervened which renders inequitable a delayed enforcement of the rights of the plaintiffs? In the face of the finding of the court that he received the property under the agreement to hold it for others, defendant is not in position to say that he, in good faith, believed the property belonged to him. Although the members of this family remained silent there was nothing to prevent him from accounting for the rents and profits, or from unloading the responsibility he had voluntarily assumed by a reconveyance of the property to its owners. That he continued to hold and manage the property is without significance in view of his complete knowledge of the actual rights of the parties. Neither do we see that the increase in value of the property created an equity in defendant. The members of this family were not in the position of mere speculators. They were beneficial owners of an interest in this property, and were entitled to share with defendant in any increase in its value. To permit all of them to gain through such a fortunate circumstance was the very purpose of all concerned in their joint efforts to save the property. After a careful study of the record as a whole, we have concluded that it is barren of any fact showing such a good faith change in conditions during the period of plaintiff's delay as renders a present enforcement of their rights inequitable. Therefore, we hold that the court erred in its conclusion that plaintiffs are estopped by their laches.

■■ The trial court found that defendant had been in the open, adverse and hostile possession of the premises since 1936. In so finding, we think the trial court erred. Defendant received the legal title in trust for the members of his family. Because that trust rested in parol, it was not enforceable; but it was not a nullity. Birchard v. Simons, 59 S. D. 422, 240 N.W. 490. Not until defendant repudiated his oral promise did he become a constructive trustee in the eyes of equity. And, in our opinion, not until he had repudiated his promise did his possession, in a legal sense, become hostile, and therefore, adverse. 2 C.J.S., Adverse Possession, § 109, p. 660. Cf. Scott on Trusts, § 481.1. The record fails to reveal such a repudiation until about 1940 or 1942.

For all of the foregoing reasons, the judgment of the trial court is reversed.

All the Judges concur.