Dwayne C. KASE, Administrator with the Will Annexed of the Estate of Olivia M. McWilliams, Deceased, Plaintiff and Appellant,

v.

Kenneth D. FRENCH and Betty M. French, Defendants and Appellees.

No. 13421.

Supreme Court of South Dakota.

Argued Oct. 28, 1981.

Decided Oct. 27, 1982.

Charles H. Whiting of Whiting, Hagg & Konenkamp, Rapid City, for plaintiff and appellant.

J. Crisman Palmer of Gunderson & Palmer, Rapid City, for defendants and appellees.

WOLLMAN, Justice.

This is an appeal from a judgment in an action brought by the administrator of the estate of Olivia M. McWilliams, deceased, (appellant) against Kenneth and Betty French to vacate a contract for deed and to recover various cash transfers allegedly obtained through undue influence. The trial court upheld the validity of the contract for deed and the cash transfers, holding that no confidential relationship existed at the time of the sale and that no undue influence resulted from the confidential relationship that subsequently did develop. We affirm.

A widow in her eighties, Mrs. McWilliams lived in a large, somewhat rundown two-story house in Rapid City. As she had a fourth-grade education and no business experience, her nephew, Charles Bruggeman, had been assisting her in the conduct of her business affairs. There was no dispute, however, that Mrs. McWilliams was mentally competent. Mr. and Mrs. Bruggeman

visited Mrs. McWilliams frequently and regularly ran errands for her even though they lived in Belle Fourche.

Charles Bruggeman was named as one of several beneficiaries in Mrs. McWilliams' original will. She gave him a general power of attorney in 1969 and added his name to her checking account and certificates of deposit. One year later she revoked this power of attorney. He continued to assist her with her business affairs, however, and their relationship continued on the same basis as before this revocation. Mrs. McWilliams also executed a new will in 1970 in which she left her entire estate to various branches of medical research.

Mr. and Mrs. French moved to Rapid City in 1971, where they purchased a small neighborhood grocery store. They delivered groceries as part of their service. In 1972 Mr. French delivered an order of groceries to Mrs. McWilliams. As he made her acquaintance he was struck by her resemblance to his grandmother. He commented upon this to Mrs. French and suggested to her that she also make Mrs. McWilliams' acquaintance. Once the two women met, a friendship quickly developed between them. Soon after their meeting, Mrs. French stopped by to see Mrs. McWilliams and found that she had injured herself in a fall. From that time on Mrs. French called on Mrs. McWilliams daily and started to help her with household work and other chores. About a month after meeting, Mrs. French told Mrs. McWilliams that she need never be lonely again because they, the Frenches, would take care of her for the rest of her life.

During the latter part of 1972 or early in 1973, the Frenches suggested to Mrs. McWilliams that she move to a dwelling that was less dilapidated. They testified that Mrs. McWilliams countered with the suggestion that they buy her home and fix an apartment in it for her. Within a few months, and after the Frenches had the property appraised (at $35,000), it was agreed that Mrs. McWilliams would sell her property, consisting of two lots, the home, a separate dwelling called the annex, and the personal property and fixtures in the home and the annex, to the Frenches for $40,000. There was to be no downpayment, and the purchase price was to be paid, with interest at the rate of one percent per year, in monthly payments over a period of twenty years ($184 per month) beginning two years after the date of sale. Mrs. McWilliams was to continue to occupy an apartment in the house, rent free, for two years.

Either Mrs. French or Mrs. McWilliams asked Mr. Eugene Christol, Mrs. McWilliams' attorney, to go to the McWilliams home to discuss the impending transaction. Both the Frenches and Mrs. McWilliams participated in this conversation and related the terms of the sale already agreed to. Mr. Christol attempted to dissuade Mrs. McWilliams from selling her property under terms so inadequate to provide for her support and expenses for the rest of her life. He explained to her that one of the shortcomings of the proposed transaction was that the interest rate was not proper. In addition, he reminded her that other parties had expressed interest in buying her property at a far higher price. Mr. Christol testified that this advice made no impression on Mrs. McWilliams and that it appeared to him that her mind was set to transact the sale under those terms in spite of his advice and warnings. He testified that he asked Mr. Bruggeman to also try to persuade Mrs. McWilliams to change the terms of the transaction. Mr. Bruggeman testified that he reminded his aunt of a previous offer for her property of $90,000. (Neither Mr. Christol nor Mr. Bruggeman, however, was able to document any offers at trial.) Mr. Bruggeman was also unable to convince Mrs. McWilliams to take a second look at the terms and was informed by Mrs. McWilliams that she no longer needed him to take care of her business because the Frenches would do that for her. Eventually, Mr. Christol prepared a contract for deed according to the terms specified by Mrs. McWilliams and the Frenches. Very shortly thereafter Mrs. McWilliams removed Mr. Bruggeman's name from all her bank, savings and loan accounts, and certificates of deposit, and opened a joint

account with the Frenches. Mr. Brugge-
man continued to visit his aunt but no
longer counseled her on her business af-
fairs.

Mr. French testified that although Mrs.
McWilliams did not want any interest, she
thought that such an interest-free arrange-
ment would not be legal. He further testi-
fied that Mrs. McWilliams suggested one
percent interest because she was aware of
one percent government loans available af-
ter the 1972 Rapid City flood and therefore
thought that one percent would be legal.
The Frenches' testimony reveals that they
were aware that the going interest rate in
Rapid City at the time of the sale ranged
from six to eight percent. Neither Mr. nor
Mrs. French informed Mrs. McWilliams of
this fact.

■ The trial court found that a confi-
dential relationship existed between Mrs.
McWilliams and the Frenches only follow-
ing the sale of her residence to the French-
es. Appellant contends that this finding
was clearly erroneous. We agree.

"A confidential relationship 'exists when-
ever trust and confidence is reposed by the
testator in the integrity and fidelity of an-
other.'" *Matter of Heer's Estate,* 316
N.W.2d 806, 810 (S.D.1982) (quoting *In re
Estate of Hobelsberger,* 85 S.D. 282, 291,
181 N.W.2d 455, 460 (1970)). "[A] [c]onfi-
dential relationship is not restricted to any
particular association of persons. It exists
whenever there is trust and confidence, re-
gardless of its origin." *Hyde v. Hyde,* 78
S.D. 176, 186, 99 N.W.2d 788, 793 (1959).
"Such a confidential relation exists between
two persons when one has gained the confi-
dence of the other and purports to act or
advise with the other's interest in mind."
*Schwartzle v. Dale,* 74 S.D. 467, 471, 54
N.W.2d 361, 363 (1952).

In the light of the contacts Mr. and Mrs.
French had with Mrs. McWilliams and of
the fact that the promise to take care of
Mrs. McWilliams was made prior to the sale
of her home, we conclude that a confiden-
tial relationship existed between Mrs.
McWilliams and the Frenches at the time of
the sale of the property.

■ The existence of a confidential rela-
tion requires the dominant party "to exer-
cise the utmost good faith and to refrain
from obtaining any advantage at the ex-
pense of the confiding party." *Hyde v.
Hyde,* supra, 78 S.D. at 186, 99 N.W.2d at
793. In *Davies v. Toms,* 75 S.D. 273, 281, 63
N.W.2d 406, 410 (1954), an action to set
aside a deed, this court stated:

While ... the "burden of proof" never
shifts from the one who undertakes to set
aside a deed on the ground of undue
influence, there is a burden that does
transfer over to the other side when evi-
dence offered shows a relationship of
trust and confidence.... The latter
type burden this court has called the
"burden of going forward with the evi-
dence." ... [T]he burden then rested on
appellants to show that they took no un-
fair advantage of their dominant posi-
tion....

The Frenches were therefore under a duty
to go forward with the evidence and show
that the transaction was free from undue
influence. *Hyde v. Hyde,* supra. See also
*Niles v. Lee,* 31 S.D. 234, 140 N.W. 259
(1913). During cross-examination as well
as during the presentation of their witness-
es, the Frenches, in fact, went forward with
evidence as required by our decisions. Thus
we are satisfied that the failure of the trial
court to make the proper finding on the
issue of the existence of a confidential rela-
tionship does not require reversal of the
judgment.

■ The indicia of undue influence are:
person susceptible to undue influence, op-
portunity to exert undue influence and ef-
fect wrongful purpose, disposition to do so
for improper purpose, and result clearly
showing effect of undue influence. *Matter
of Estate of Landeen,* 264 N.W.2d 521 (S.D.
1978); *In re Rowlands' Estate,* 70 S.D. 419,
18 N.W.2d 290 (1945). The trial court con-
cluded that "at all times [Mrs. McWilliams]
enjoyed good health, was able to care for
herself, was mentally alert and competent
to the time of her death, was a strong-
willed person and independent in her think-

ing, and was not weak willed or easily influenced." The record supports this finding. Even appellant in his brief describes Mrs. McWilliams as a "strong willed and stubborn old lady, [who] was not about to take advice."

■ We cannot say that the contract for deed clearly shows the effect of undue influence. The Frenches called as a witness the realtor who had appraised the property at $35,000. While the interest and downpayment terms were certainly favorable to the Frenches, Mrs. McWilliams received the favorable term of being able to live rent free in an apartment for two years. Although the promise to take care of Mrs. McWilliams for the rest of her life was not incorporated into the contract for deed, Mrs. McWilliams did, in fact, live with Mr. and Mrs. French rent free for one and a half years. Also, when Mrs. McWilliams was later placed in a nursing home, Mrs. French signed an agreement which made her the responsible party in the event of problems with payment.

This court has recognized the presence of independent legal advice as an important factor to be considered in determining whether undue influence exists. *Davies v. Toms,* supra; *In re Daly's Estate,* 59 S.D. 403, 240 N.W. 342 (1932). Appellant attempts to undermine the importance of the advice of Mrs. McWilliams' attorney, Mr. Christol, because his advice was neither accepted nor acted upon. Appellant characterizes Mr. Christol's role as one of a draftsman who simply reduced to writing what was already agreed upon. We cannot agree with this characterization. Mr. Christol had been the attorney for Mrs. McWilliams since 1965. He had also given legal advice to her deceased husband and sister. His advice to Mrs. McWilliams was anything other than perfunctory. Cf. *Black v. Gardner,* 320 N.W.2d 153 (S.D.1982). When Mr. and Mrs. French and Mrs. McWilliams informed Mr. Christol of the terms of their proposed contract, Mr. Christol explained to Mrs. McWilliams why he thought the contract would be a poor business agreement for her. He delayed in writing the contract

and called Mr. Bruggeman to inform him of his opinion of the proposed contract. Merely because Mrs. McWilliams chose not to follow Mr. Christol's advice does not destroy the importance of her having received that advice.

The trial court found that the Frenches had neither taken unfair advantage of Mrs. McWilliams nor exerted undue influence upon her in any of their dealings. Given the trial court's opportunity to judge the credibility of the Frenches on the basis of their courtroom demeanor and testimony, we cannot say that this finding is clearly erroneous. SDCL 15–6–52(a); *In re Estate of Hobelsberger,* supra.

Appellant contends that he is entitled to judgment against the Frenches for all money received from Mrs. McWilliams after the contract for deed transaction. Our review of the record satisfies us that the trial court's treatment of this aspect of appellant's case also finds support in the evidence and thus should not be set aside.

The judgment is affirmed.

FOSHEIM, C.J., and DUNN, and MORGAN, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

### ACTION

This action to vacate a contract for deed and cash transfers, being equitable in nature, is on meritorious appeal to this Court. The majority opinion permits the Frenches to enrich themselves at the expense of an elderly lady, Mrs. McWilliams (her estate), thereby weakening the safeguards which courts of equity have historically employed to protect the weak. I dissent as the evidence does not disclose that the Frenches were the Good Samaritans they professed themselves to be unto Mrs. McWilliams nor to the South Dakota courts. Rather, the factual history reflects that the Frenches took advantage of Mrs. McWilliams by gaining her confidence, placing themselves in a fiduciary relationship, abusing that confidential and fiduciary relationship,

profiting exceedingly when they were in a dominant position as compared to the dependent position of Mrs. McWilliams, and by garnering most of her earthly possessions and home before she died. By this dissent, I sustain and defend her cause.

There are three principal issues to this appeal which are recited and treated below with supporting reasons and authorities. To avoid repetition, the facts are not separately set forth but are included in the discussion on the issues.

### ISSUES

1) Did a confidential relationship exist as between Mrs. McWilliams and the Frenches at the time of the real estate transaction by which Mrs. McWilliams contracted to sell her home in Rapid City to the Frenches? Yes, and, in my opinion, this included a fiduciary relationship encompassed within that confidential relationship.[1] The majority opinion is actually reversing the trial court on the issue of confidential relationship although it does not expressly say so. The majority opinion must necessarily had to have found that the trial court's decision in this regard was clearly erroneous. With this aspect of the majority decision, I agree.

2) At the time of the real estate transaction, and conceding that a confidential relationship existed between the Frenches and Mrs. McWilliams, did the Frenches meet their burden of proof that (a) they took no unfair advantage of their dominant position and (b) that they did not unduly profit at the expense of Mrs. McWilliams? No, and as detailed below, the transaction was unfair, inequitable, and the Frenches unduly profited arising from the confidential relationship causing a significant loss to Mrs. McWilliams.

3) The trial court found that a confidential relationship existed subsequent to the sale of Mrs. McWilliams' home to the Frenches. Is the estate of Mrs. McWilliams entitled to a judgment for approximately $31,456.09 constituting money in the form of "gifts," money which the Frenches

obtained from Mrs. McWilliams when this confidential relationship existed? Yes, as treated below, for the reason that not only did a confidential relationship exist, but a fiduciary relationship as well, and the gifts cannot be sustained for the Frenches were the dominant individuals and Mrs. McWilliams was dependent upon them. The gifts were presumptively fraudulent and voidable and the Frenches failed to overcome this presumption.

### I.

Not once, but twice, Mrs. French testified that "I told her she would never have to be lonely again."

Counsel: When was it that you told her that for the first time.

Mrs. French: Oh, probably after I met her, a month or so.

During examination of Mrs. French, this question was further asked:

Counsel: And again, there was a time when you advised Mrs. McWilliams that you would take care of her for the rest of her life?

Mrs. French: Yes. I told there was— that we would see that she was never lonely and that *we would see that she had money.* (Emphasis mine.)

Author's note: The Frenches had no money to give to Mrs. McWilliams; Mrs. McWilliams had sufficient money to comfortably care for herself throughout her short life expectancy.

A nephew, Charles Bruggeman, testified that he called on Mrs. McWilliams approximately one month prior to the sale of the home. He was told that he was, in effect, discharged from his duties which he had previously performed for his aunt in connection with her business affairs. And, henceforth, the Frenches *would look after her business affairs* for her. (Emphasis mine.) The record discloses that the Frenches, indeed, proceeded to attend to her business affairs (other than the contract for deed transaction). Example: Mrs.

---

1. *See In Re Rowlands' Estate,* 70 S.D. 419, 18 N.W.2d 290 (1945), wherein Justice Roberts recognized the theoretical concept of a confidential *and* fiduciary relationship.

McWilliams sold her Harding County land and received a check for $7,974.29 from the real estate agent who handled the sale and then turned the check over to the Frenches. This check was deposited in their bank account and they admitted using it for their own purposes. Until such time as they placed Mrs. McWilliams in a nursing home (she was crying as Mrs. French left), the Frenches received checks on Mrs. McWilliams' bank account, cashed certificates of deposit belonging to Mrs. McWilliams, and placed their names on her bank accounts. Many checks, signed by Mrs. McWilliams, were in Mrs. French's handwriting. There can be no doubt that, within the broad framework of the inceptual confidential relationship, there came into existence a fiduciary relationship. Lewis Rohrer, trust officer of the National Bank of South Dakota,[2] testified that Mrs. McWilliams related to him (after she had been left in a nursing home) that she placed full confidence in the Frenches and signed various documents for them and did not pay attention to what she was signing. After leaving Mrs. McWilliams in a nursing home, Mrs. French wrote to Mrs. McWilliams which writing, among other things, stated: "I will bring you a complete financial statement and a list of your furniture in a week. When I try to talk to you, you don't understand, we just talk in circles." (Yes, Mrs. McWilliams was quite elderly and perhaps could not understand all of the representations or actions of the Frenches. This is why equity should protect and shield her.) The financial statement was never furnished. One day prior to admitting Mrs. McWilliams to the nursing home, Mrs. French prepared a document, on file herein, which purported to be a will yet required the signatures of Mrs. McWilliams and the Frenches. Under this instrument, Mrs. McWilliams would leave all of her possessions and money unto the Frenches who in turn would provide for her care. Mrs. McWilliams refused to sign. By

this time, and she so expressed, she realized that the Frenches had taken her money and that she had been dumped. In determining the existence of a confidential relationship as applied to this case, I also approve of the language contained in *Hyde v. Hyde,* 78 S.D. 176, 99 N.W.2d 788 (1959) and *Davies v. Toms,* 75 S.D. 273, 63 N.W.2d 406 (1954) (*Davies*), cited in the majority, as authority for determining that a confidential relationship existed in this case. Under the evidence herein, however, contrary to the admonition of *Davies,* the Frenches took an unfair advantage of their dominant posiion. Ending up with her home and most of her money was taking advantage of her. If their acts were for love and charity, why was that not the harvest? The harvest was property and money.

## II.

At the time of the real estate transaction, Mrs. McWilliams was a widow of 83 years of age with a fourth-grade education and no business experience. Undeniably, she was lonely. She apparently had no close acquaintances or relatives in Rapid City and her two nephews lived in Belle Fourche, one of whom was close to her. The Frenches were in the prime of life, Kenneth French being 47 and Betty French 48 years of age. Mr. French was a businessman.

Concerning the sale of Mrs. McWilliams' home to the Frenches, the majority opinion notes: "Neither Mr. nor Mrs. French informed Mrs. McWilliams of this fact" (that the going interest rate in Rapid City at the time of the sale ranged from six to eight percent). Notwithstanding this observation, the majority opinion finds no wrongdoing on the house sale. The majority opinion fails to recognize that once it has been established that the Frenches were in a confidential or fiduciary relationship, they owed a duty to divulge a fair rate of interest to her. McClintock On Equity at 224 (1948), tells us: "An intentional, active

---

**2.** In 1975, acting under the dominion of the Frenches, Mrs. McWilliams changed her will to include the Frenches as her sole beneficiaries. Believing that she had been mistreated and abused by the Frenches, on April 11, 1977, she executed a new will disinheriting the Frenches which named the National Bank of South Dakota as trustee and thereby willed her remaining earthly possessions to a sight foundation and medical research programs.

concealment of a fact of which the other party is known to be ignorant has the same effect as a false statement, but mere non-disclosure does not invalidate the transaction, unless some previous relationship or transaction between them has imposed some obligation to make disclosure." McClintock further states at 225: "The principle that a party can keep silent with respect to matters of which he knows the other is ignorant applies only when the parties are dealing at arm's length. Where there is such a relationship between them, or such relationship has recently existed, as to justify the mistaken party in relying upon the other for information with respect to the transaction, the latter must make full disclosure." The Frenches failed to make full disclosure. During the course of trial, witness Lewis Rohrer submitted a summary, duly received into evidence, reflecting that monthly payments on $40,-000.00 amortized over 20 years at 8% interest would amount to $334.58 per month or $150.58 more than the monthly payments of $184.00 provided for by the contract. Such computation reflects a difference of $36,-139.20, which the Frenches would pay under an 8% interest rate as compared to a 1% interest rate under the contract. This offends one's sense of good morals and fair dealings and should require a court of equity to act in response thereto. This unfair interest rate was known to the Frenches, they who said they would take care of her the rest of her life and who said she would never be lonely again. Yes, and they who "would see that she had money." As the record indicates, the Frenches, a few years earlier, had paid 6¾% interest on their loan to get into the grocery business. These facts, these figures, demonstrate that the Frenches took unfair advantage of Mrs. McWilliams and that they profited handsomely at her expense. For people who were going to do good (to her), they did very well. Mrs. French admitted, under oath, that neither she nor her husband ever suggested to Mrs. McWilliams that the 1% interest rate was not a fair rate or the going rate of interest.

Counsel: You just took the position that if she was satisfied with that (1%), why that is the way it would be; is that right?

Mrs. French: Yes.

It is obvious from reading the record that Mrs. McWilliams honestly believed that a 1% interest rate was legally alright because the SBA was making 1% interest loans to flood victims in Rapid City. She had heard it on the radio. Equity was born out of conscience. Does not equity owe a duty to impose conscience on the Frenches? No downpayment and no payments for two years is also unconscionable.

Mrs. McWilliams called upon her attorney, Mr. Christol, not with seeking advice on her mind to accept his counsel. Rather, she called upon her attorney to have the contract prepared (exactly as she and the Frenches had decided) then being under their total influence and dominion.

Seemingly, the majority opinion would instill the Frenches' position with a defense because Mr. Christol's advice was sought. But the majority opinion fails to recognize that this is only a defense when the advice is sought and acted upon, and not when the advice is given and then rejected by a closed mind. As in *Davies,* cited in the majority opinion, "[h]er mind was made up." 75 S.D. at 279, 63 N.W.2d at 409. This case supports my position that the advice given implies at least an apparent open-mindedness on the part of the recipient, and Mrs. McWilliams did not have an open mind. I further believe that language found in *In Re Daly's Estate,* 59 S.D. 403, 240 N.W. 342 (1932) (*Daly*), supports my position that the rejected advice of Mr. Christol does not obliterate or soften the overreaching of the Frenches. *Daly* quotes from Jones' Commentaries on Evidence, vol. 2, § 190:

One of the most important requisites of the validity of these transactions between persons acting under the influence of these confidential relations is, that the party presumably under the influence of the other should have had independent advice from a lawyer, who is devoted

entirely to the interest of the party he is called upon to advise, and in whom that party had entire confidence.

*Daly,* 59 S.D. at 408, 240 N.W. at 344. At no time did Mrs. McWilliams place any confidence in Mr. Christol's advice. She ignored it.

As indicated in *Dibel v. Meredith,* 233 Iowa 545, 10 N.W.2d 28, 30 (1943) (*Dibel*), a confidential relationship (in the instant case, it was fiduciary as well) was explained "[i]n law it has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party." Here, the Frenches did not act in good faith for Mrs. McWilliams; they acted for themselves. In *Matter of Estate of Herm,* 284 N.W.2d 191, 200 (Iowa 1979), the Supreme Court of Iowa approved of its language in *Dibel* and further expressed: "Where such a confidential relationship exists, a transaction by which the one having the advantage profits at the expense of the other will be held presumptively fraudulent and voidable." I disagree with the conclusion of the majority opinion that the Frenches took no unfair advantage of their dominant position. The results of their efforts patently establish unfair advantage.

### III.

Of the $31,456.09 that the Frenches obtained from Mrs. McWilliams, the Frenches maintain this accumulation was a series of gifts except for the first $4,000.00 they obtained from her.

When the Frenches put Mrs. McWilliams into the nursing home against her wishes and left her crying and confused, she was apparently given a check for $11,200.00. Ostensibly, this was in repayment of a $4,000.00 note and a refund of the proceeds of the sales of Harding County land, plus interest thereon. The trial court found a

confidential relationship between Mrs. McWilliams and the Frenches, but confined this finding to all times subsequent to the sale of the home. Mrs. French took Mrs. McWilliams to various banks and savings and loan associations where Mrs. McWilliams had money on deposit, for the express purpose of having Mrs. McWilliams withdraw money from her accounts to turn the money over to the Frenches. In this, the confidential relationship was used and abused and the gifts are presumptively fraudulent and voidable and the Frenches have failed to overcome this presumption. Moreover, the Frenches were writing checks and conducting the business affairs for Mrs. McWilliams, and occupied a fiduciary relationship with her.[3] 36A C.J.S. *Fiduciary* § 389 (1961) provides:

It is a doctrine repeatedly announced that courts of equity will scrutinize with the most jealous vigilance transactions between parties occupying fiduciary relations toward each other, and particularly any transaction between the parties by which the dominant party secures any profit or advantage at the expense of the person under his influence.

Transactions between parties to a fiduciary relation are presumptively fraudulent and void, and will be stricken down unless their fairness is established by clear and convincing proof, and the burden of proof is on the party asserting validity with respect thereto.

*Accord, Merritt v. Easterly,* 226 Iowa 514, 284 N.W. 397 (1939). The Frenches have not met any burden of proof to establish fairness in securing these thousands of dollars of gifts in a short period of time from an absolute stranger who, one month after she met them, was told that she would never be lonely again and "we would see that she had money." Thus, the trial court's finding that the Frenches "did not

---

**3.** The Frenches secured and kept Mrs. McWilliams' strong box in their home which contained her valuables. The trust officer obtained it and her bank statements. Investigating the transactions over a period of months, the trust officer compiled a list of transactions that unveiled the overreaching and said list is Exhibit "7" herein. The trust officer also obtained a list of furniture and personal belongings of Mrs. McWilliams from the Frenches shortly before she died. These were sold at public auction.

take unfair advantage of Olivia" is clearly erroneous. This reviewing Court should be left with a definite and firm conviction that a mistake has been committed. *In Re Estate of Hobelsberger,* 85 S.D. 282, 289, 181 N.W.2d 455, 459 (1970). The Frenches did not see that Mrs. McWilliams had money. Rather, they took her money.

Mrs. McWilliams obviously turned over these large sums of money to the Frenches for a reason. The only logical explanation is that she honestly believed that the Frenches would take care of her for the rest of her life. The trial court awarded the estate, and thus, Mrs. McWilliams, a sum equal to the amount which the trustee had expended for Mrs. McWilliams' care in the nursing home. The rationale of the trial court was founded in equity. The trial court expressed "I conclude that they [the Frenches] should be required to reimburse Olivia's [Mrs. McWilliams] estate for the expenses paid for her care and keep, including medical costs, if any, and incidentals. Since they have had the use of the money in the meantime, it should bear interest from the date of Olivia's [Mrs. McWilliams] death. If there is a credit left over on the computations concerning the $12,200 and the $4,000 loan and land sale proceeds, it will be credited on this item."[4]

As a fiduciary, the Frenches had no right to breach or abuse their relationship with Mrs. McWilliams. *See* Dobbs, *Law of Remedies* at 680 (1973). I would reverse and direct that the trial court enter a judgment voiding the unconscionable contract for sale and further direct the trial court to credit the Frenches for the money expended in the repair, remodeling, and improvement of the real property. Furthermore, I would reverse and direct the trial court to restore unto the estate all inter vivos gifts plus interest, believing that a court of equity will not suffer a wrong to be committed without fashioning a remedy. This well could include the appointment of a referee to take evidence to establish the necessary arithmetic calculations to put the court's judgment into effect. *See* McClintock on Equity at 76.

4. I deduce that the trial court required the repayment of a $4,000 loan and a $11,200 check and $1,000 check the Frenches gave Mrs. McWilliams upon and after entry into the nursing home. Although not clear, the $12,200 must represent the return of a land sale proceeds in Harding County plus interest.