JOHNSON, Respondent v. BURKE et al., Appellants

(63 N. W.2d 794)

(File No. 9401. Opinion filed April 7, 1954)

286</>

**Jackson & Krause,** Lemmon, for Plaintiff and Respondent.

**Morrison & Skaug,** Mobridge, for Defendant and Appellant.

SMITH, P. J.   It was adjudged by the trial court that: (1) defendant Horr holds title to nine quarters of Corson county land, and described lots in the city of McIntosh in trust for plaintiff, John Johnson, and (2) plaintiff is entitled to a conveyance of this property upon delivery to defendant of his promissory note in the sum of $6,274.03, together with a real estate mortgage describing the nine quarters of land as security for the payment of said note.   The appeal of the defendant Horr questions the sufficiency of the evidence to support the court's findings and conclusions.

In the aspect most favorable to plaintiff, the record reveals these facts.

Plaintiff was the owner in fee of two of these quarters of land and of all of the city lots, and by force of contracts with Corson county, he was the equitable owner of the seven remaining quarters of land.   He had mortgaged all of this property to one August Peterson; that mortgage had been foreclosed; the sheriff's certificate on foreclosure issued to Peterson had been assigned to defendant Cyrus Burke; and sheriff's deed had issued to Burke.   With the title in this state, defendant Burke delivered to plaintiff an option to purchase all of the property on or before December 1, 1952 for $5,054.

On Saturday afternoon, November 29, 1952, one Penfield took plaintiff from McIntosh to the home of defendant Horr in Lemmon to make application to Horr for a loan.   After they had talked briefly at Lemmon the three men drove to McIntosh where they went to the office of defendant Burke. Talk about a loan to plaintiff started at Lemmon and was continued during the trip to McIntosh and while they remained in Mr. Burke's office.   During these talks Mr. Horr not only made inquiry about the character and quality of the nine quarters of land but he also learned that (a) plaintiff's interest in the land would be cut off at noon on December 1, (b) there was due to Burke $5,137.60, (c) some additional money would be required by plaintiff to pay a balance due to the county on its contracts and for taxes, and (d) there was a judgment against plaintiff for about $250.   They also talked about the terms of the loan plaintiff wanted and it was agreed that it should be for five years with equal an-

nual payments and 8% annual interest, secured by a mortgage on the nine quarters of land. Attempt was made to contact plaintiff's lawyer to ascertain the amount required to clear the land, and to have him draft the necessary papers to close the deal. He could not be found. At some point before he had secured all of the items of information listed supra and while they were talking about one or more of the uncertain items, Mr. Horr suggested that he give a check to Mr. Burke and the amount due on the item or items they were discussing could be ascertained later. Thereupon Mr. Burke made out a check for $5,137.60, the amount due under plaintiff's opition, and Mr. Horr signed and delivered it to Mr. Burke. Talk continued, and it was agreed that the papers would be drawn and the matter concluded on Monday. Horr told plaintiff to have the mortgage run to Riley M. Horr.

On Monday plaintiff saw his lawyer and was informed it would be four or five days before he could make out the papers. Plaintiff then started on a trip to Montana. At Lemmon he called defendant Horr on the telephone and explained what his lawyer had said. He also told him he had to go to Montana and would return in two or three days. Horr indicated that would be agreeable, and suggested they could get another lawyer to draw the papers. On Thursday when plaintiff returned from Montana he went to Mr. Horr's house. Mr. Horr said in substance that Mr. Burke had given him, Mr. Horr, a warranty deed to the land and plaintiff was "all out". He said "you're out and I have already rented it to somebody, to some one to farm."

The circumstances of the conveyance from Burke to Horr were described by Mr. Horr. He said he called Mr. Burke on the phone and "told him if he didn't want the land, —well make me a deed to it." This was done while plaintiff was in Montana.

Thereafter in clearing record title to the land Mr. Horr paid the county $708.96, the balance on the contracts above-mentioned, and $177.26 for taxes. He also discharged a federal income tax lien in the sum of $204.16, and expended $46.05 for abstracting, recording and traveling. Thus his total investment amounted to $6,274.03. This was a larger

sum by several hundred dollars than the parties talked about on November 29; nothing had been said about the income tax lien and the amount due the county was larger than anyone suggested on November 29. It also appears that there were docketed in Corson county judgments against plaintiff as follows: On May 11, 1949 for $289.53 and on October 27, 1951 for $271.80.

The evidence establishes that on November 29, 1952, plaintiff and defendant Horr did not reach an agreement fixing the total amount Horr would loan to plaintiff. It further establishes that neither of these parties then contemplated the necessity of a loan of considerably over $6,000 to permit plaintiff to take title and give Mr. Horr a senior lien mortgage on the nine quarters of land. Because of these established facts, defendant Horr asserts the evidence is insufficient to support the findings, conclusions of law and judgment. It is his position that proof of a firm commitment by Horr to loan plaintiff a definite sum is essential to sustain the conclusions and judgment, and that the evidence reveals no more than preliminary negotiations which never resulted in such a firm commitment. With this contention in mind we choose to separately consider the validity of the two central conclusions of law of the trial court.

The first inquiry is whether the court was warranted in concluding as a matter of law that Mr. Horr holds the title to this real property in trust for plaintiff.

■ A finding of the court which is not open to serious debate reads as follows: "By clear, satisfactory and convincing evidence, it appears that at the time that the Defendant Horr gave the check to Defendant Burke on November 29, 1952, for something over $5,000.00 it was done for the benefit of the Plaintiff to protect Plaintiff's rights under the option contract which was to expire December 1, 1952, and that the Defendant Horr then intended to take up whatever other amounts were necessary to clear Plaintiff's title to the land upon which Defendant Horr was willing to make the loan." It is obvious that when Mr. Horr paid Mr. Burke $5,137.60 on the afternoon of Saturday, November 29, 1952 that a debtor and creditor relationship immediately arose between plaintiff and Mr. Horr. It is just as obvious that

under SDC 59.0102(4) as exemplified by Scott v. Liechti, 70 S.D. 89, 15 N.W.2d 1, 3, when Mr. Burke conveyed such title as he had to defendant Horr, an implied trust arose in favor of plaintiff. As applying to such a set of circumstances in Scott v. Liechti, cited supra, this court quoted with approval from the comment under Sec. 448, Restatement of the Law of Trusts, as follows:

> " 'In the situation stated in this section the result is the same as though the transferee first lent the amount of the purchase price to the borrower, and the borrower then paid the amount so borrowed to the vendor and the conveyance was than made by the vendor to the lender. Although the purchase price was not paid directly by the borrower to the vendor, it is paid for him by the transferree and the borrower is in substance the person who pays the purchase price.' "

The controlling statute provides:

> "When a transfer of real property is made to one person and the consideration therefor is paid by **or for** another, a trust is presumed to result in favor of the person by or **for whom** such payment is made." SDC 59.0102(4).

In considering this branch of the case, we accept defendant Horr's assumption that he was not bound by agreement with plaintiff to make the additional above described payments included in his aggregate investment of $6,274.03. However, the fact is that he did make those payments after he had advanced $5,137.60 on behalf of plaintiff. We are unaware of any legal reason which would prevent Mr. Horr from so acting to protect the loan he had made to plaintiff. However, we are firm in our conviction that in the eyes of equity he must be deemed to have made the additional advances in furtherance of his trust, and on behalf of plaintiff. It follows, of course, that in winding up his trust Mr. Horr will be entitled to repayment of his total investment with interest.

■ The court's conclusion that Mr. Horr holds the property in trust for plaintiff finds solid support in the facts

for a different reason. By the payment of $5,137.60 to Mr. Burke on behalf of plaintiff Mr. Horr created an equitable title in the property in plaintiff. Thereafter he secured conveyances from Mr. Burke and the county, and sought to defraud plaintiff. He told him he was out and has persisted in refusing to recognize plaintiff's equitable rights. By such unconscionable conduct he supplied the trial court with a basis for invoking the remedial device known as a constructive trust. 54 Am.Jur., Trusts § 188, p. 147; Schwartzle v. Dale, 74 S.D. 467, 54 N.W.2d 361. In re National Benefit Association, 72 S.D. 23, 29 N.W.2d 81; and In re Zech's Estate, 69 S.D. 51, 6 N.W.2d 432. To prevent Mr. Horr from so unjustly enriching himself at the expense of plaintiff, the trial court was warranted in converting him into a constructive trustee for plaintiff. Scott on Trusts, § 462.2; 54 Am. Jur., Trusts § 219, p. 169.

Whether we are now enforcing a substantive implied trust, or a remedial constructive trust is of no practical moment.

■ We turn to a consideration of the conclusion which in substance is that upon delivery to defendant Horr of a note for $6,274.03 due in five annual installments with interest at 8% per annum and a mortgage securing the same describing the above-mentioned real estate he is entitled to receive a conveyance of such real estate from defendant Horr. As we have indicated supra, it is clear from a study of the evidence that plaintiff and Mr. Horr did not contemplate on November 29, 1952 that considerably more than $6,000 would be necessary to permit plaintiff to receive a conveyance and deliver a senior lien mortgage to Mr. Horr. Because Mr. Horr did not agree to loan plaintiff so large a sum we think the described conclusion and the judgment resting thereon are erroneous. In our opinion the defendant should have been required to convey upon repayment of his investment with statutory interest.

The foregoing view was anticipated in the briefs of plaintiff and the suggestion was there made that the judgment below could be modified to conform thereto. In reply counsel for Mr. Horr asserts generally that the record below

will not support such a modification, and specifically that the complaint fails to offer reimbursement to Mr. Horr.

■ ■ With these contentions in mind we have made a careful examination of the record. We content ourselves with the observation that we conclude such a modified judgment does find support in the allegations and prayer of the complaint, the evidence, the findings and the theory of the trial below. It is true that, except to indicate a willingness to execute and deliver the described note and mortgage, the complaint fails to offer to do equity. The attitude of Mr. Horr at every stage of these proceedings demonstrates that such an offer of reimbursement would have been idle. This jurisdiction is numbered among those which do not look upon the ancient maxim as a rule of pleading. 30 C.J.S., Equity § 230, page 680. In Smith v. Keener, 51 S.D. 124, 212 N. W. 498, at page 499, it was written. "We have never understood that the maxim, 'He who seeks equity must do equity,' was a rule of pleading. When a party invokes the aid of equity, he subjects himself to the imposition of such terms as established equitable principles require (Story, Eq.Jurisp. [14th Ed.] § 72), but it is not always essential that he plead them." It is in response to the spirit of that maxim that we direct the modification.

The cause is remanded to the trial court with directions to bring its judgment into harmony with this opinion; as so modified the judgment is affirmed. Costs will not be allowed either party on appeal. SDC 33.1805.

All the Judges concur.