HYDE, Executrix, Respondent v. HYDE, Appellant
(99 N.W.2d 788)
(File No. 9721. Opinion filed December 8, 1959)

178

**Woods, Fuller, Shultz & Smith,** Sioux Falls, for Defendant-Appellant.

**Lacey & Parliman,** Sioux Falls, for Plaintiff-Respondent.

ROBERTS, J. This is an appeal from the judgment entered on the verdict of the jury in an action for recovery of damages for breach of contract.

The Frank Hyde Jewelry Company owned and operated a jewelry store in Sioux Falls. Its capital stock and that of the Frank Hyde Realty Company were owned by plaintiff Frank Hyde, his son Hadleigh, and daughter Esther. In January 1950, Hadleigh Hyde went to California where his sister lived and his father was vacationing for the purpose of negotiating for the purchase of their shares of stock. The brother and sister entered into a contract identified in the record as Exhibit 1, which provided in part as follows:

> "This agreement, made and entered into at Sebastopol, California, this 12th day of January, 1950, by and between Hadleigh D. Hyde, hereinafter called the first party, and Esther Hyde Howell, hereinafter called the second party, witnesseth:

> "That, whereas, the parties hereto are brother and sister, and the children of Frank Hyde (hereinafter called the father) and the stepchildren of Amanda P. Hyde (hereinafter called the stepmother), * * *

> "Now, therefore, the first and second parties do hereby agree, each with the other, as follows:

> "In the event the father shall transfer to first party all of his shares of corporate stock in the Frank Hyde Jewelry Company and in the Frank Hyde Realty Company, with the written consent of the stepmother, then second party agrees to thereupon sell to first party, and first party agrees to thereupon purchase, all of the shares of corporate stock of Frank Hyde Realty Company now owned by second party, for the total purchase price of Fifty Thousand Dollars ($50,000.00), * * *

> "As additional consideration for said transfer of shares of stock by the father, and said sale of

shares of stock by second party, the first party party agrees to pay to the father for the remainder of his life the sum of 'Seven Hundred Dollars ($700.00), per month.

"In consideration of the transfer by the father of his said shares of corporate stock to first party, with the written consent of the stepmother, and the sale by second party to first party of her said shares of corporate stock, and the agreement of first party to pay therefor, the first and second parties do hereby agree, that commencing from the death of their father, and monthly thereafter, they will each pay to the stepmother the sum of One Hundred Dollars ($100.00) per month (a total of Two Hundred Dollars ($200.00) per month), until the remarriage of the stepmother, or until each of the first and second parties shall have paid to the stepmother the sum of Sixteen Thousand Five Hundred Dollars ($16,500.00) or a total of Thirty-three Thousand Dollars ($33,000.00) such payments to cease either upon remarriage of the stepmother, or when said total payment shall have been made. * * *"

The contracting parties went from Sebastopol where the the above agreement was signed to Glendale, California, to negotiate with their father and stepmother. The father signed an agreement which is dated January 13, 1950, reciting that he had read the foregoing agreement entered into between his son and daughter and that in consideration thereof assigned and transferred all his right, title and interest in the shares of stock owned by him in the two corporations, but did not agree to transfer the residential property in Sioux Falls, and the terms in the agreement prepared for his signature so providing were deleted by pen and ink. The stepmother signed a separate agreement consenting to the stock transfer.

After returning to Sioux Falls and consulting with an accountant, Hadleigh Hyde had another agreement prepared, identified in the record as Exhibit 2. The agreement was

mailed to the father in California with a letter of explanation written by Hadleigh Hyde. This contract signed by Frank Hyde on February 1, 1950, provided in part as follows:

"This agreement between Frank Hyde Jewelry Co., a Corporation, first party (herein called "Jewelry Company"), Frank Hyde Realty Company, a corporation, second party (herein called "Realty Company"), Frank Hyde, third party, and Hadleigh D. Hyde, fourth party, all of Sioux Falls, South Dakota, witnesseth: * * *

"Third party hereby agrees to sell and surrender his said 103 shares of stock in first party to first party for the amount of the book value thereof, to-wit $37,860.14, and third party hereby agrees to sell and surrender his said 40 shares of stock in second party to second party for the amount of the book value thereof, to-wit $5,469.52, said shares of stock to be forthwith cancelled and retired and payment therefor to be made in installments as hereinafter provided. * * *

"There shall be paid to the said Frank Hyde out of the purchase price of said stock as aforesaid the sum of $700.00 on the first day of each calendar month, commencing with February 1, 1950, and continuing so long as he, the said Frank Hyde, shall live.

"After the death of the said Frank Hyde, there shall be paid to Amanda Hyde, wife of the said Frank Hyde, if then living, the sum of $100.00 per month, commencing with the first day of the first calendar month after the death of the said Frank Hyde, and continuing until her death, or until her remarriage, or until she shall have been paid the full sum of $16,500, whichever shall be earlier.

"Any balance remaining after the death of the said Frank Hyde, and the completion of the payments that will be due to the said Amanda Hyde as above provided (or any balance remaining after the

death of Frank Hyde in the event of Amanda Hyde's prior death) shall be paid to fourth party, the said Hadleigh D. Hyde, in consecutive monthly installments of $500.00 per month, commencing with the first day of the first month following termination of the prior payments provided above; the final payment to be the balance remaining after the last full installment payment. * * *

"Fourth party, Hadleigh D. Hyde, hereby personally guarantees the performance of each and every convenant and agreement hereof on the part of first and second parties to be performed in favor of the said Frank Hyde and Amanda Hyde."

The action herein was instituted on November 22, 1957, to recover payments under the agreement described as Exhibit 1. The complaint alleges that there were accrued installments in the amount of $26,400 due and owing to the plaintiff at the time of the commencement of the action. Defendant Hadleigh Hyde answered and as an affirmative defense alleged that the second contract superseded the former and that all sums due and owing had been fully paid. The jury returned a verdict in favor of the plaintiff in the sum of $19,535.65 and judgment was entered accordingly. Plaintiff died shortly after the trial, and his executrix is respondent on this appeal. Reference to the parties unless otherwise indicated will be made as they appeared in the trial court before substitution.

Plaintiff had been paid the price of the stock agreed upon in the second contract. The theory upon which this action was based was that payments under the terms of the first contract were to continue during the lifetime of the plaintiff and that the obligation to make such payments was not extinguished by the second contract. An issue in the action is whether or not by the transactions in question novation by substitution resulted. SDC 47.0238 provides: "Novation is made: (1) By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; (2) By the substitution of a new debtor in place of the old one, with intent to release

the latter; or (3) By the substitution of a new creditor in place of the old one, with intent. to transfer the rights of the latter to the former." Novation is not effective unless there is an intention on the part of the parties to extinguish the old obligation by substituting the new one therefor. Klinkoosten v. Mundt, 36 S.D. 595, 156 N.W. 85, L.R.A.1918B, 111. As stated in 39 Am.Jur., Novation, § 21: "In order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed. The intention of the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor and creditor. The point in every case, then, is, did the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all the circumstances. The existence of such an intention may, of course, be found, even though there is nothing positive in the agreement. In other words, the intention to substitute one contract for another so as to constitute a novation need not be expressed, but may be inferred from the circumstances. The issue of novation presents questions of fact if there is any supporting evidence and the terms of the agreement are equivocal or uncertain." See also City National Bank of Huron, S. D. v. Fuller, 8 Cir., 52 F.2d 870, 79 A.L.R. 71; Alexander v. Angel, 37 Cal.2d 856, 236 P.2d 561; Credit Bureaus Adjustment Department v. Cox Brothers, 207 Or. 253, 295 P.2d 1107, 61 A.L.R.2d 750, annotation at page 755.

 The first contract was retained by the plaintiff and the second contract is entirely silent as to its effect upon the prior contract. Defendant contends that by reason of inconsistencies between the terms of the second contract and those of the prior one the latter was superseded. It is argued that plaintiff could not sell his shares of stock to the defendant and also to the corporations for retirement and cancellation which was the mode for disposition of the

shares of stock provided in the second contract. While for ordinary purposes a corporation is regarded as a legal entity separate and distinct from its stockholders, yet, as recently pointed out in Larson v. Western Underwriters, Inc., 77 S.D. 157, 87 N.W.2d 883, the entity may be disregarded where the corporation is the mere alter ego or business conduit of an individual. Defendant became the sole owner of the shares of stock in both corporations with the exception of a few shares held by his two sons to qualify them as directors. It is obvious that the rule upon which defendant relies to the effect that a contract complete in itself will be conclusively presumed to supersede a prior one where the terms of the two are so inconsistent that they cannot subsist together is not here applicable.

It appears from the evidence that plaintiff while in Glendale, California, received the second contract by mail, read the accompanying letter, signed the contract and mailed it back to defendant. The letter is not in evidence. The testimony of the defendant is that the letter to his father included the explanation that it wasn't possible to make the monthly payments from the amounts of salaries that could reasonably be paid to him by the corporations; that the payment of $1,000 monthly to the father and sister from this source would require, inclusive of taxes, salaries of "almost twice that amount" which was more than profits from the businesses would warrant; and that the father would receive "much more net money as it (proceeds from stock redemption) would not be" taxable as "income". Plaintiff testified that he was 94 years of age and had resided in Sioux Falls since 1887; that while the letter transmitting the contract mentioned something about taxes it did not state that payments would terminate on full payment of the purchase price of the shares of stock; that he did not talk to a lawyer or anyone else about Exhibit 2; that because he "always put great faith" in his son he probably did not read the letter thoroughly and that he signed the contract "to get the taxes straightened up." He testified that it was his custom to take a vacation every winter in California or Florida and leave the handling of corporate affairs and businesses to his son and that eventually his

son assumed full and complete control. When questioned further regarding their relationship, plaintiff testified that prior to the transactions in question he had always reposed confidence in his son. Defendant admitted that responsibility of handling his father's business affairs was left largely to him and that in his opinion his father "placed great trust and confidence" in him.

It is argued that plaintiff having signed the contract Exhibit 2 was conclusively presumed to have known its contents and to have accepted its terms and that it was error to submit to the jury the questions whether a confidential relation existed between the parties and if so whether the confidence was betrayed rendering the contract voidable at the election of the plaintiff. The court below in denying defendant's motion for judgment notwithstanding the verdict observed that at the time of the transaction in question the father was 87 years of age; that defendant was professionally trained and a successful business man; that the father for years relied upon and placed absolute confidence in his son in business matters; that the manner in which the first contract was obtained indicated the confidence reposed by the father in his son and the latter's knowledge of that confidence; that defendant took the train to Sebastopol, California, where he visited his sister and discussed with her the family business and the acquisition of the shares of stock in the two corporations; that they had an agreement prepared before they talked to the father and the stepmother; that the agreement was signed by the father as prepared including the provision for the transfer of the home in Sioux Falls to defendant and his sister; and that such provision was not stricken until after the agreement was submitted to the stepmother for her signature. The father testified that he did not know that he was releasing defendant from his agreement to pay $700 per month during his lifetime and this is understandable. The stepmother had no knowledge of the signing of the second agreement and as before stated the father had no explanation of the terms of the second contract other than the letter from his son which according to his version simply explained that for

income tax purposes he should sign and return the contract.

Confidential relationship is not restricted to any particular association of persons. It exists whenever there is trust and confidence, regardless of its origin. 17 C.J.S. Contracts § 132. In some instances, as between attorney and client or trustee and cestui que trust, the relation is said to be confidential as a matter of law. However, the existence of such a relationship as between parent and child is a question of fact to be detemined from the evidence. Shaffer v. Shaffer, 344 Pa. 158, 23 A.2d 883; Jensen v. Phippen, 225 Iowa 302, 280 N.W. 528.

The existence of a confidential relation imposes a duty on the party in whom the confidence is reposed to exercise the utmost good faith and to refrain from obtaining any advantage at the expense of the confiding party. In re Daly's Estate, 59 S.D. 403, 240 N.W. 342. A presumption of undue influence may arise from a transaction between persons standing in a confidential relation requiring the person in the superior dominant position to go forward with the evidence and show that the transaction was free from undue influence. Niles v. Lee, 31 S.D. 234, 140 N.W. 259; Egan v. Burnight, 34 S:D. 473, 149 N.W. 176, Ann.Cas.1917A, 539; Davies v. Toms, 75 S.D. 273, 63 N.W.2d 406. The principle is not restricted to cases where there was a design to take an unfair advantage. Pomeroy in his work on Equity Jurisprudence (Fifth Edition), § 955 says: "Nor does undue influence form a necessary part of the circumstances, except so far as undue influence, or rather the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement, not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine."

There was some conflict in the testimony as to the content of the letter transmitting the contract to the

plaintiff. Plaintiff admittedly received no independent advice concerning the scope and effect of the second contract. The court gave an instruction to the effect that the jury could take into consideration in determining the fairness of the transaction the fact whether or not independent advice had been given. The instruction amounts to no more than a statement that the existence or nonexistence of independent advice is merely evidence bearing upon the question as to whether the transaction was fair and free from undue influence. It may be noted that in some jurisdictions it is an established principle that persons standing in a confidential relation toward others cannot entitle themselves to hold benefits unless they show to the satisfaction of the court that the persons conferring the benefits had competent and independent advice. See cases collected in Annotation in 123 A.L.R. 1505. Proof that independent advice was or was not given, at least, had a bearing on the issue of undue influence. See Egan v. Burnight, supra; In re Daly's Estate, supra. Under the circumstances of this case jury could find that defendant abused the relation of trust and confidence that existed between his father and himself by inducing him to enter into the second agreement.

Defendant assigns as error the refusal of the court to give certain instructions requested by him. In view of what we have herein stated with reference to the law and the facts of the case we are satisfied that the instructions of the court as a whole were correct and that the instructions requested were in each instance properly refused.

A motion for continuance was made by defendant at the commencement of the trial on the ground of surprise. It is asserted that at a pretrial conference it was agreed that the only issue presented was whether or not the second contract superseded the first and that the claim of undue influence was as much a surprise as though it were presented by a new pleading. Counsel for plaintiff denies that there was such settlement of issues between them. SDC 33.1003 provides that an order shall be made reciting the action taken at a pretrial conference including agreements made by the parties as to all matters considered.

No such order controlling the subsequent course of the action was entered and the parties were not precluded by admissions, if any, at the pretrial conference. See Kindley v. Williams, 76 S.D. 225, 76 N.W.2d 227, 57 A.L.R.2d 1070. The granting of a continuance is in the sound discretion of the trial court. The question of the existence of an obligation to make payments under the first contract was the basic issue and we do not have a situation where defendant may have been entitled to reconsider its defenses in the light of newly alleged facts. An abuse of discretion does not appear and the trial court was warranted in denying the motion.

The judgment appealed from is affirmed.

All the Judges concur.