**H. Leslie BROWN, by and through his Conservator, Robert W. Kaplan, Appellant,**

**v.**

**E. Eugene LAMBDIN and Vietta Lambdin, Appellees.**

**No. 46669.**

Supreme Court of Oklahoma.

Dec. 17, 1974.

Rehearing Denied March 4, 1975.

Northcutt, Northcutt, Ellifrit, Raley & Gardner by C. D. Northcutt, Ponca City, for appellant.

Martin, Pringle, Schell & Fair, Wichita, Kan., and Gurley & McClung by John H. Gurley, Blackwell, and Paul K. Swartz, Wichita, Kan., for appellees.

WILLIAMS, Vice Chief Justice.

This is an appeal by plaintiff, H. Leslie Brown, from judgment for defendants, Eugene Lambdin and Vietta Lambdin, in an action for the cancellation of a deed executed by plaintiff at a time when he was 88 years of age and in poor health. Eugene Lambdin had formerly been plaintiff's guardian, conservator and trustee. Plaintiff is the cousin of defendants, a brother and sister, and all parties reside in Wichita, Kansas. The deed conveyed about 400 acres of valuable farm land in Grant County, Oklahoma, from plaintiff to defendants.

In the petition filed in his behalf by the new conservator appointed for him by the Probate Court of Sedgwick County, Kansas, plaintiff alleged, in effect, that the defendants, "individually or collectively and in concert with each other", and while in a fiduciary relationship with him, persuaded him to execute the deed conveying the land to them by the exercise of undue influence, including advice that the transaction would have the effect of reducing probate expenses and estate taxes in the event of his death. There was no allegation that plaintiff was mentally incompetent at any time. He asked that the deed be cancelled.

At the trial, plaintiff produced no evidence that Vietta Lambdin had anything at all to do with the execution of the deed concerned; as a matter of fact, there was uncontradicted evidence that she first learned about it from plaintiff himself several weeks after it was executed. We therefore summarize the evidence, much of it uncontradicted, as to the relations between plaintiff and Eugene Lambdin.

In his opening statement at the beginning of trial on June 11, 1973, counsel for plaintiff announced that about two months earlier, plaintiff had "lost his ability to be lucid" and was "physically unable" to be present in court or give a deposition.

Plaintiff was a man of considerable means who never married, lived alone and took care of his own personal needs, including cooking. His vision and hearing were defective and at time of trial he used a hearing aid and could read only by using a hand-held magnifying glass. He had two elderly sisters. Defendant Eugene Lambdin, who was about 25 years younger, had known plaintiff all of his life. Apparently at some time in 1966, Lambdin received a letter from the younger of the two sisters asking Lambdin to take care of her older brother and sister if anything happened to her. As a result of this request and later conversations with Brown, Lambdin was appointed Brown's guardian and conservator by the Probate Court of Sedgwick County, Kansas, in May, 1967. The record shows that Brown and Lambdin were represented by separate counsel at the hearing. It appears that the appointment was made because of Brown's physical incapacity and not because of any mental deficiency. Thereafter, Lambdin "took care of his person, his property, his welfare and his health". The elder sister died in 1966 and the younger one in 1967.

Beginning early in 1968, and after learning about the expenses involved in the probate of a sister's estate, Brown became concerned about the expenses and taxes that would accrue in the event of his own death. Lambdin accordingly conferred with certified public accountants and attorneys specializing in tax matters, who recommended that plaintiff's property be placed in a trust. Don Lambdin, an attorney who was "very, very distantly related" to both plaintiff and defendants, who had been serving as attorney for the guardian and conservator, drafted the necessary legal instruments after conferences with Eugene Lambdin. It appears that Don Lambdin was not personally acquainted with plaintiff before the guardianship proceedings were begun in 1967.

On February 10, 1971, after proper proceedings in the Probate Court of Sedgwick County, Kansas, and upon a petition signed by plaintiff personally, the guardianship and conservatorship were judicially terminated and Eugene Lambdin was discharged. Again, plaintiff was represented by separate counsel at the hearing on his petition. The next day plaintiff executed a Revocable Trust Agreement by the terms of which he placed all of his property in three separate trusts (A, B and C) for his use and benefit with Eugene Lambdin as trustee. Trust A consisted of some city lots in Kansas and Colorado and the 400 acres of land in Grant County, Oklahoma, here concerned; Trust B consisted of about 2000 acres of land in Kiowa County, Colorado; and Trust C consisted of about $90,000 in various banks and savings institutions and 257 shares of corporate stock. Brown made provision in the trust instrument for the distribution of all of his property to his relatives (cousins) and three charitable institutions in the event of his death; the farm lands in Grant County, Oklahoma, involved in this action, were to be distributed to Eugene Lambdin and Vietta Lambdin. At the same time this instrument was executed, Brown also executed a last will and testament, by the terms of which the Grant County lands were devised to Eugene Lambdin and Vietta Lambdin.

Plaintiff's concern for reducing expenses and taxes continued and Lambdin conferred further with tax attorneys and cer-

tified public accountants with respect to the tax effects of a present conveyance of the Grant County lands. He reported the results of these conferences to plaintiff, and thereafter, on instructions from Eugene Lambdin, Don Lambdin prepared the necessary legal instruments. Eugene Lambdin picked them up at the attorney's office and delivered them to plaintiff for his review. When Lambdin left the room, plaintiff was reading them with his magnifying glass. About ten days later, at plaintiff's request, Eugene Lambdin made an appointment with Don Lambdin for the execution of the instruments. At the appointed time on December 13, 1971, Lambdin took Brown to the attorney's office. Also present were Don Lambdin, his secretary and another attorney.

As an attorney, Don Lambdin realized the significance of the fiduciary relationship of the parties. He accordingly asked plaintiff "some general questions for the purpose of determining whether he knew what he was doing and whether it would be all right for him to execute" the instruments. He testified further that "I told him that we were removing the Oklahoma property from the trust in order to save the estate taxes, deeding it to Gene and Vietta Lambdin, and he knew what the documents were that he signed".

It may be observed at this point that Don Lambdin was called as a witness by, and testified freely for, the plaintiff in the trial of this action. The evidence summarized in the preceding paragraph was given only after rather persistent cross examination by counsel for the defendants, who had taken his deposition about a month before trial.

Plaintiff then executed an Amendment of Revocable Trust Agreement which had the effect of removing the Grant County property from the trust. It included the following paragraph:

> "It is the desire of the Grantor that the above described real estate not be held in trust by the Trustee, E. Eugene Lambdin, for the use and benefit of the Grantor. It is the desire and direction that upon reconveyance by the Trustee to the Grantor, that the Grantor, H. Leslie Brown, intends to convey the above described real estate to Vietta Lambdin and E. Eugene Lambdin, in their individual capacity, as a gift to them from the undersigned Grantor."

Eugene Lambdin, as trustee, then executed a deed conveying the Grant County property back to Brown, after which Brown executed the deed conveying it to defendants.

Apparently about four months later, for reasons not shown in the evidence and unknown to Eugene Lambdin, there was what counsel called a "cleavage" between plaintiff and Eugene Lambdin, and plaintiff became very antagonistic toward him. Early in April, 1972, plaintiff called Don Lambdin and asked to be placed in a hospital. Don Lambdin made the necessary arrangements and plaintiff was in the hospital for several days.

On April 29, 1972, plaintiff executed an instrument revoking his will and terminating the revocable trust. At the same time he executed an instrument revoking, or attempting to revoke, the conveyance of the Grant County farm lands to defendants.

On May 30, 1972, a new conservator was appointed for plaintiff by the Probate Court of Sedgwick County, Kansas, and on August 24, 1972, this action for the cancellation of the deed to defendants was begun in the District Court of Grant County.

In the journal entry of judgment for defendants, the trial court made findings which may fairly be summarized, in pertinent part, as follows: (1) plaintiff, though of advanced years and in poor physical condition, was completely competent at the time of the transactions which are concerned in this action; (2) Eugene Lambdin was in a fiduciary relationship with plaintiff; (3) at the time plaintiff executed the documents in question, he knew what his property was and what he wanted to do with it, he was a man of independent mind and completely capable of asserting

his own will, and "he was not a weak character who was being pushed around"; (4) in February, 1971, in the trust instrument and will, he showed that the defendants were the objects of his bounty with respect to the land which is the subject matter of this action; (5) in December, 1971, he apparently decided to make a gift of the land to the defendants and the legal instruments effectuating this intention were in his possession for more than a week, during which he had ample opportunity to obtain independent legal counsel; (6) Eugene Lambdin's own testimony that he never at any time requested or suggested the transfer of the land was uncontradicted and Vietta Lambdin had no knowledge of the transfer until after the conveyance was executed. The last paragraph of the journal entry was in part as follows:

"There is a presumption which arises from a confidential relationship between a grantor and grantee and that presumption requires that the court look upon the entire transaction with suspicion and severe scrutiny. The court has viewed the transaction with such suspicion and scrutiny and finds that the evidence is quite sufficient to overcome and refute the presumption. * * *"

The court then entered judgment for defendants.

■ In the briefs in this Court, all parties agree that the rule with regard to transactions between persons in a fiduciary relationship, referred to in the last paragraph of the journal entry, quoted above, is applicable. For a lengthy and detailed statement of the general rule see 90 C.J.S. Trusts § 250; on the same general subject, see 26A C.J.S. Deeds § 208, both cited by plaintiff. See also Byrd v. Marlin, 208 Okl. 655, 258 P.2d 649, and Johnston v. McCray, 122 Okl. 301, 254 P. 979, also cited by plaintiff.

In view of the findings of the trial court, the following portions of 90 C.J.S. Trusts § 250, are helpful:

"While contracts and dealings between the trustee and cestui que trust are not absolutely prohibited and may, in a proper case, be enforced by the beneficiary, generally, a trustee cannot take beneficially from the cestui que trust, and he may not profit by any transaction he may have in relation to the trust estate at the expense of the beneficiaries. The validity of transactions between a fiduciary and his cestui que trust depends on the peculiar circumstances connected therewith. Equity looks on transactions between a trustee and the cestui que trust *with suspicion and will subject them to the severest scrutiny* * * *.
" * * *

"On the other hand, while the law exacts the utmost good faith and fair dealing, * * * the mere suggestion of the fiduciary relationship does not, of itself, invalidate the transactions, and the beneficiary is not entitled to rescind the transaction *in the absence of evidence of unfairness or fraud.* * * *" (Emphasis added).

■ The principal argument at the trial, and in the briefs on appeal, concerns the trial court's action in refusing to admit evidence of certain parol statements allegedly made by plaintiff in April and May, 1972, concerning the circumstances surrounding the execution of the deed in December, 1971. Plaintiff offered to prove these statements by the testimony of witnesses who allegedly heard them after plaintiff entered the hospital early in April, 1972. The trial court sustained defendants' objection that the proffered testimony was hearsay.

In this Court, plaintiff argues that the evidence was admissible, citing Harmon v. Kerns, 169 Okl. 290, 36 P.2d 898, and Wigmore on Evidence §§ 1725 and 1738.

In *Harmon*, an action to establish a parol gift of land, this Court approved the admission of declarations of the deceased alleged donor "as explanatory of the nature and character of his occupancy and possession and of his claim of ownership", and the evidence concerned was documentary in nature. In the case new before us,

the proffered testimony concerned oral statements, and there was no issue as to the "nature and character" of the claims of plaintiff.

The citations from Wigmore on Evidence are not helpful to plaintiff. Section 1738 concerns the admission of declarations of a testator having to do with the "mental and emotional conditions" of the testator. Section 1725 is, by its own terms, limited to statements of a "present existing state of mind". In the case now before us, there was neither allegation nor evidence that plaintiff was mentally deficient in any way at the time the conveyance to defendants was executed, and, as the trial court observed, there was no issue as to his "present existing state of mind" (at the time the statements were allegedly made in April and May, 1972).

The proffered testimony meets the classic definition of hearsay: "evidence which derives its value, not solely from the credit to be given to the witness on the stand, but in part from the veracity and competency of some other person"; 29 Am.Jur.2d Evidence, § 493; In re Porter's Estate, 208 Okl. 475, 257 P.2d 517. We hold that the trial court did not err in excluding the testimony.

At the trial, defendants presented the testimony of another cousin of plaintiff, who was well acquainted with him. This witness was asked to describe "Mr. Brown's character and personality in the late fall of 1971 or the fall of '71, as you observed him, as to whether or not he was a man that was easily influenced or easily confused or whether he had a mind of his own and was prone to do what he wanted to do". This witness testified:

> "He had a mind of his own. We had no occasion to influence him in anything. He would always tell us what to do and when he wanted to do it.
>
> "* * *
>
> "That is the way I would pick him out to be. He had a mind of his own. When he wanted to go home, he wanted to go home. If he didn't want to go home to dinner or come to McPherson to see us, he wouldn't go. That is your answer."

In his remarks from the bench at the time of pronouncing judgment, the trial judge discussed his reasons for holding for defendants. These remarks, in part, were as follows:

> "* * * We also have some evidence here that he was a man who could make up his own mind and see it through, even though in poor physical condition, as evidenced by the fact here in April after these transactions he changed his mind about some things and he certainly made some changes. He knew what to do to get things done. He, for some reason, at that time became opposed to Mr. Gene Lambdin and he let it be known and he backed it up. He exercised his right and showed his own will. So he was not a weak character that was just being pushed around, even though he was of advanced age and his physical condition was certainly not of the best. * * * And also the evidence does not —in fact, there is some positive testimony here that Mr. Eugene Lambdin never, at any time, asked for anything or tried to influence Mr. Brown. There is nothing to rebut that testimony * * *. * * * I'm asked here, from a presumption, to go ahead and presume that Eugene Lambdin, I guess, is a crook just out to get all he could get. I can't quite follow that presumption because I think if he had been operating that way, Vietta Lambdin wouldn't be named in here. I think he would have been the only one, if that was what he was trying to do. I believe the evidence is quite sufficient to overcome and refute the presumption. * * *"

After a careful consideration of the entire record before us, we cannot say that the judgment of the trial court is clearly against the weight of the evidence. On the contrary, we think the following circumstances shown in the evidence support the judgment: (1) Lambdin became

guardian and conservator at the behest of his elderly relatives who apparently had no closer relative to help them in their latter years; (2) at both the hearing for the appointment of the guardian and the later hearing for the termination of the guardianship, Brown was represented by separate counsel; (2) the course of events which included the creation of the revocable trust and the later conveyance of the Grant County farm lands to defendants was pursuant to competent advice from attorneys and accountants specializing in tax matters; (3) at a time when Brown was admittedly competent he showed, in the revocable trust agreement and the will, that defendants were the objects of his bounty with respect to the Grant County farm lands; (4) the conveyance to defendants was not executed in secret but in the presence of witnesses in the office of an attorney who, realizing the significance of the fiduciary relationship, first determined to his own satisfaction that Brown knew what he was doing. All of these circumstances taken together, lend some justification to the remark of defense counsel, in argument to the trial judge, that plaintiff's action for the cancellation of the deed really amounted to an effort to vary the terms of a written instrument by parol evidence.

■ In cases of equitable cognizance, the judgment of the appellate court should not lightly displace the judgment of the trial court, which had the advantage of observing the witnesses on the stand. Renegar v. Bruning, 190 Okl. 340, 123 P.2d 686.

■ In an action for the cancellation of an instrument, this Court will weigh the evidence, but will sustain the judgment on appeal unless it is clearly against the weight of the evidence, or is contrary to law or established principles of equity. Clovis v. Clovis, Okl., 460 P.2d 878.

The application for certiorari is granted; the judgment of the Court of Appeals is vacated, and the judgment of the trial court is affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and IRWIN, HODGES, LAVENDER, BARNES and DOOLIN, JJ., concur.

BERRY and SIMMS, JJ., dissent.

SIMMS, Justice (dissenting):

Brown, grantor in the deed sought to be cancelled, created a revocable trust. Lambdin was trustee. While acting in the capacity of trustee and apparently at the request of Brown, Lambdin discussed Brown's estate tax situation with a tax accountant and attorney. Lambdin then recommended to Brown the trust be revoked and 400 acres of valuable Oklahoma land be deeded to Lambdin and Lambdin's sister.

It is undisputed that at the time of the revocation of the trust and the execution of the purported deed, Brown was nearly deaf; had a "history of bilateral cataracts with removal, and extremely thick lenses to aid in his vision"; had been the ward of Lambdin for approximately five years; and, Brown was 88 years, 5 months, 1 week, of age.

The existence of a fiduciary relationship between H. Leslie Brown, grantor in the general warranty deed in question, and Eugene Lambdin, one of two grantees, is admitted.

It is further admitted that grantees paid no monies in consideration for the deed.

While the trial judge, and the majority of this Court, have attempted to examine the entire transaction "with suspicion and severe scrutiny", I cannot agree with the conclusion reached by the majority. I feel that while the law requires careful scrutiny of such a transaction, because of the age, physical condition, and fiduciary relationship existing in this case, we must undertake a microscopic scrutiny under the guidelines hereinafter set forth.

The majority cites 90 C.J.S. Trusts § 250, which states:

"On the other hand, while the law exacts the utmost good faith and fair dealing,

* * *, the mere suggestion of the fiduciary relationship does not, of itself, invalidate the transaction and the beneficiary is not entitled to rescind the transaction *in the absence of unfairness or fraud.* * * *" (E.A.)

I have no quarrel with the generalization taken from Corpus Juris Secundum, however, legal inquiry into transactions arising between persons holding a fiduciary relationship is more exacting by reason of case law.

In 1926, this Court in Kernel v. Murrell, 122 Okl. 22, 250 P. 420, held:

"The law looks with suspicion upon transactions between trustees and beneficiaries, and, when the cestui que trust sells trust property to the trustee, the burden is placed upon the grantee or trustee to whom such transfer is made to show that the grantor or cestue que trust was in possession of full information and acted upon her own volition or *independent advice,* and free from all influence of the grantee or trustee to whom such transfer is made." (E.A.)

In its examination of a transaction involving fiduciaries, it is not necessary for the Court to search for affirmative evidence of fraud or undue influence. Pomeroy on Equity Jurisprudence (5th Ed.) § 955, says:

"Nor does undue influence form a necessary part of the circumstances, except so far as undue influence, or rather the ability to exercise undue influence is *implied* in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement, not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine."

The *Pomeroy* rationale was followed in Blanton v. Blanton, 276 Ala. 681, 166 So.2d 409 (1964):

"This court has further held that the dominant party in a confidential relationship has a duty to protect the interest of the other party and the burden of proving that he had in good faith exercised that duty is on the dominant party. This view was initially expressed in Bancroft v. Otis, 91 Ala. 279, 8 So. 286 * * *. The rule there stated was to the effect that undue influence with respect to transactions inter vivos may exist without either coercion or fraud. It may result entirely from the confidential relationship, without activity in the direction of either coercion or fraud on the part of the beneficiary occupying the position of dominant influence. It is upon him not only to abstain from deceit and duress, but to affirmatively guard the interest of the weaker party, so that their dealings may be at arm's length. To presume undue influence in such a case is not to presume fraud or coercion, or any act which is malicious in se, but simply the continuance of the influence which naturally inheres in and attaches to the relation itself."

"* * * It remains but for us to consider whether or not the weaker party had such disinterested, independent and competent advice as to rebut the presumption that the transaction was the result of undue influence on the part of the appellant."

It is, therefore, established that a rebuttable presumption of undue influence arises by a grantor transferring property to a grantee, without consideration, if the grantee holds a fiduciary relationship with the grantor. We turn our attention to the necessity of the grantor actively obtaining "independent advice", as opposed to the grantor's "opportunity for independent advice", in order for the fiduciary-grantee to overcome the rebuttable presumption.

We believe the better rule to be set forth in McFail v. Braden, 19 Ill.2d 108, 166 N.E.2d 46 (1960):

"As pointed out in the case last cited, important factors in determining whether a transaction is fair include a showing by the fiduciary (1) that he made a full and frank disclosure of all the relevant information that he had; (2) that the consideration was adequate; and (3) that the principle had independent advice before completing the transaction."

*McFail, supra,* involved an attorney purchasing real éstate from an 83 year old client, for what was alleged to be insufficient consideration. Quoting further from *McFail*:

"The evidence shows, too, without contradiction, that Ida Chandler was completely without independent counsel during the transaction with her attorney. Considering her age, her physical condition and the relative experience and education of the parties, the transaction could well be said to be unfair and presumptively fraudulent on this basis alone."

The Supreme Court of South Dakota in Hyde v. Hyde, 78 S.D. 176, 99 N.W.2d 788, 794, recognized that in some jurisdictions proof of independent advice is needed to overcome the presumption of undue influence where a transaction involving a gift by a principal to a trustee is involved:

"It may be noted that in some jurisdictions it is an established principle that persons standing in a confidential relation toward others cannot entitle themselves to hold benefits unless they show to the satisfaction of the court that the persons conferring the benefits had competent and independent advice."

The scope, type, and necessity for independent advice, in transactions involving a fiduciary relationship, was clearly spelled out in Mahunda v. Thomas, 55 Tenn.App. 470, 402 S.W.2d 485:

"The rule as to independent advice, as stated by Felts, J., speaking for this Court, Middle Section, in Roberts v. Chase [25 Tenn.App. 636, 166 S.W.2d 641], is as follows:

'The circumstances of some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is by showing that his principle had the benefit of independent advice. (citing cases)'

"In Turner v. Leathers, the rule is stated as follows:

'The rule of independent advice means that the advisor must not only be competent but independent.

'Proper independent advice in this connection means that the donor had the (preliminary) benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interest of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of his proposed benefactions.'" Turner v. Leathers, 191 Tenn. 292, 297–298, 232 S.W.2d 269, 271.

Necessity of "independent advice" as that term has been used by appellate courts in other jurisdictions, was developed by this Court in White v. Palmer, Okl., 498 P.2d 1401 (1971) wherein it was held:

"When the legal presumption of undue influence has arisen by showing confidential relations, *whether in disposition of property inter vivos* or by will, the burden of proof is upon the party seeking to take the benefit of such disposition to rebut the presumption attaching thereto by showing either a severance of the confidential relations, or that the party making the disposition had competent and independent advice in regard thereto. Hunter v. Battiest, supra [79 Okl. 248, 192 P. 575]. Independent advice has been held to mean *the testator had the benefit of conferring fully and privately about the consequences* of his intended will with a person who was not

only competent on such matters, but who was so disassociated from the interest of the beneficiary named there as to be in a position to advise with the testator impartially and confidentially. Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099."

The only testimony offered to show the grantor received the essential independent advice necessary to sustain the validity of the deed was that of Mr. Donald Eugene Lambdin, an attorney of Wichita, Kansas, who is distantly related to both Brown and the Lambdins. Attorney Lambdin testified on direct examination at trial as follows:

"Q. In connection with those deeds, prior to the execution, did you ever consult with H. Leslie Brown regarding the effect of those deeds?

A. No, I did not. He was in my office with Mr. Lambdin, but I had no consultation with him concerning the effect of signing the deeds and gave him no advice.

Q. From whom did you get the information which led to the drawing of the amendment and the deeds?

A. From Mr. Gene Lambdin, it was at his request.

Q. I will ask you whether or not he was present with Mr. Brown at all times during the preparation, if he actually came, if Mr. Brown actually came, or at the time of the signing?

A. They were both present at the time of the signing and I think there was one previous time that they may have been in the office together, but they were together."

On cross-examination, Attorney Lambdin testified as follows:

"Q. Well, you did, at the time of this meeting when the documents were signed, you did ask some general questions for the purpose of determining whether he knew what he was doing and whether it was allright with him? Isn't that right?

A. Yes, whether he knew what he was signing.

Q. Let's see if you can just answer my questions. Confine yourself, please, to answering my questions. At the time these documents were executed in your office with Mr. Brown present, you did ask him some general questions of determining whether he knew what he was doing and whether it was allright with him to execute them? Is that true or false?

A. That is correct.

Q. That was the purpose you had in mind for doing it? Right?

A. That is true.

Q. That was not the first time you had acted as a lawyer for the execution of documents of the transaction of business affairs under circumstances where you felt it was necessary or appropriate to make such general inquiries?

A. That's right. That is true."

I would submit that the propounding of general questions by the then present attorney for the obvious purpose of ascertaining the mental capacity of the grantor to execute the questioned deed falls far short of the required independent advice which is enunciated in *White, supra.*

Because of Brown's advanced age, his physical infirmities, and because of the lengthy fiduciary relationship enjoyed by Lambdin with Brown, in "scrutinizing" the transaction wherein Brown conveyed property to Lambdin and Lambdin's sister, I would legally presume undue influence by reason of the confidential relationship, and require the grantee to produce evidence of "independent advice" to rebut this presumption. Absent evidence of "independent advice", I would invalidate the deed in question.

I, therefore, respectfully dissent to the majority opinion in this case.

I have been authorized to state that Justice BERRY joins in this dissent.