#27140-a-GAS
**2015 S.D. 26**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JERMAR PROPERTIES, LLC,                          Plaintiff and Appellee,

  v.

LAMAR ADVERTISING CO.,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. TIMM
Judge

* * * *

THOMAS F. BURNS of
Watertown, South Dakota                          Attorney for plaintiff and
                appellee.


EDWARD C. CARPENTER
STEPHEN C. HOFFMAN of
Costello, Porter, Hill, Heisterkamp,
 Bushnell & Carpenter, LLP
Rapid City, South Dakota                         Attorneys for defendant and
                appellant.


* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 17, 2015

OPINION FILED **05/06/15**

SEVERSON, Justice

[¶1.]     Jermar Properties, LLC brought a quiet title action against Lamar Advertising Co. to determine whether Jermar held title to real estate free of Lamar's claimed leasehold interest.  The circuit court granted judgment in favor of Jermar.  Lamar now appeals.  We affirm.

## Background

[¶2.]     In 1999, James Stadheim entered into a lease with Flack Signs.  The lease gave Flack Signs the right to erect three advertising signs on Stadheim's property, and it provided for a ten-year term, ending in February 2009.  Thereafter, it "automatically renew[ed]" on a yearly basis.  However, the "total of such extensions [was] not to exceed ten years[,]" and the lessee had the right to terminate the lease "at the end of any such yearly extension period."  The lease was never recorded.  Flack Signs erected two signs on the property, each approximately thirty-feet tall with sign faces of twelve by forty-eight feet.  In 2002, Guy Carlson acquired Stadheim's property, but Stadheim retained the rights to the lease payments until 2009.  Also in 2002, Lamar Advertising Co. acquired Flack Signs.

[¶3.]     Carlson first gave a mortgage on the property to Dacotah Bank in 2005.  He gave other mortgages to Dacotah Bank over the years; all were cross-collateralized.  In 2006, Lamar built a third sign on the property, similar to those previously erected.  In 2009, Carlson, believing the lease had terminated, attempted to negotiate a lease with another company for increased annual rent.  At some point he became aware of the yearly extensions and entered into a second lease with Lamar instead.  Although the first lease would have automatically continued for ten

years if Lamar did not terminate it, the new lease provided a term of fifteen years, and removed a clause which allowed the lease to be terminated if the lessor "erect[ed] a permanent, substantial building thereon, requiring removal of the lessee's sign structures[.]" It also provided that the annual rent would increase beginning in 2011.

[¶4.]  Eventually Carlson listed the property for sale with Al Engstrom. In 2012, Carlson defaulted on the mortgages to Dacotah Bank and entered into an agreement for non-judicial voluntary foreclosure. Either Engstrom or Dacotah Bank gave Jermar a copy of the 2009 lease. A member of Jermar testified at the court trial that the president of Dacotah Bank represented that the lease would be terminated upon foreclosure. A notice of foreclosure and of a right to redeem was mailed to and received by Lamar. However, Lamar chose not to redeem. Jermar purchased the property from Dacotah Bank. Carlson gave Dacotah Bank a warranty deed and Dacotah Bank gave a quit claim deed to Jermar. Both were recorded on October 19, 2012.

[¶5.]  After Jermar bought the property and asked Lamar to remove the signs, Lamar produced the 1999 lease and claimed it still had a leasehold interest. In response, Jermar filed a quiet title action alleging that the 2009 lease was a novation of the 1999 lease. The circuit court found that the 2009 lease constituted a novation and granted judgment in favor of Jermar. Lamar appeals asserting that the 2009 lease was not a novation, and therefore they continue to have a leasehold interest by virtue of the 1999 lease that was senior to the mortgage given to Dacotah Bank.

## Analysis

[¶6.]        Both parties agree that the 1999 lease is senior to the mortgage given to Dacotah Bank, and the circuit court found that the 2009 lease was junior to the mortgage. Therefore, the only issue on appeal is whether the 2009 lease constituted a novation, thereby eliminating the leasehold rights under the 1999 lease. "Novation is the substitution by contract of a new obligation for an existing one and is subject to the rules concerning contracts in general." SDCL 20-7-5. "Essential elements of novation are: (1) a previous valid obligation, (2) agreement of all parties to the substitution under a new contract based on sufficient consideration, (3) extinguishment of the old contract, and (4) the validity of the new contract." *Ducheneaux v. Miller*, 488 N.W.2d 902, 911 (S.D. 1992) (quoting *Haggar v. Olfert*, 387 N.W.2d 45, 50 (S.D. 1986)). Thus, we have explained that "[t]he point in every case . . . is[] did the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all the circumstances." *Haggar*, 387 N.W.2d at 50 (quoting *Hyde v. Hyde*, 78 S.D. 176, 183, 99 N.W.2d 788, 791 (1959)). Intent may be found even if the new agreement is silent on intent. *Hyde*, 78 S.D. at 183, 99 N.W.2d at 791. "[T]he intent to effect a novation may be inferred from the circumstances surrounding the creation of a new obligation." *Haggar*, 387 N.W.2d at 50.

[¶7.]        It is not apparent from the terms of the 2009 lease whether it was meant to replace the 1999 lease. "[N]ovation presents questions of fact if there is any supporting evidence and the terms of the agreement are equivocal or

uncertain." *Hyde*, 78 S.D. at 183, 99 N.W.2d at 792 (quoting 39 Am. Jur. *Novation* § 21) (internal quotation mark omitted); *see also* 58 Am. Jur. 2d *Novation* § 22 (2015); *Herb Hill Ins., Inc. v. Radke*, 380 N.W.2d 651, 654 (N.D. 1986) (citing *Hyde*, 78 S.D. at 182-83, 99 N.W.2d at 791-92) ("[T]he question of whether or not there has been a novation is a question of fact if the evidence is such that reasonable persons can draw more than one conclusion."). There is conflicting evidence in the record as to whether the parties intended the second lease to constitute a novation; therefore, whether a novation occurred is a question for the fact-finder which we review under the clearly erroneous standard. *See Hofer v. Merchs. State Bank of Freeman, S.D.*, 823 F.2d 271, 272 (8th Cir. 1987) (applying clearly erroneous standard to bankruptcy court's determination that no novation occurred).

[¶8.]          The 2009 lease makes no reference to the 1999 lease. The circuit court found that one party to the new lease, Carlson, "regarded the 1999 year lease as altogether done." The court also explained that the material terms of the leases are different[1] and the 2009 lease does "not contemplate any necessity whatever to look back to the 1999 lease." Its terms extend the lease beyond the extension period of the 1999 lease. Further, there are conflicting provisions between the leases; the second lease prohibits the lessor from erecting anything that obstructs the view of

---

1.      Lamar cites to *General Outdoor Advertising Co. v. Dougherty*, 75 S.D. 369, 371, 65 N.W.2d 634, 635 (1954), for the proposition that "[s]light modifications and variations made with the consent of the parties do not abrogate the entire contract and the rights and obligations of the parties thereto, but the original contract continues in force except as altered by such modifications and alterations[.]" As the case explains, such a rule is specific to building contracts and is not applicable here. *Id.* *See* 17A C.J.S. *Contracts* § 556 (2014).

the billboards or from allowing other advertising structures, whereas the first lease allowed the lessor to terminate the lease upon thirty days' notice if lessor erected structures that would require removal of lessee's signs.

[¶9.]     There was testimony at trial that Lamar did not intend to release the automatic extension period by executing the subsequent lease. Lamar argues that its annual payment indicates that it treated the lease as a "renewal" rather than replacement, which demonstrates that they did not intend the second lease to constitute a novation. The lease, executed in June 2009, contained the following provision: "This Lease shall be for a term of fifteen (15) years commencing on the first day of the calendar month following the date of completion of construction of the sign, or, if this is a renewal Lease, the term and payments begin February 1, 2009." Lamar maintains that it made payments in February of each year, thereby indicating that they treated it as a "renewal Lease[.]" A "renewal" is "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." *Black's Law Dictionary* (10th ed. 2014). In contrast, "extension" is "[t]he continuation of the same contract for a specified period."[2] *Id.* Therefore, Lamar's

---

2.     Bryan A. Garner explains that:

> Both of these words [extension and renewal] are used in referring to the continuation of a legal contract, such as a lease. But the two have undergone a subtle differentiation with sometimes important ramifications: an *extension* continues the same contract for a specified period, whereas a *renewal* institutes a new contract that replaces the old one. Unfortunately, some courts muddle the two words, using them interchangeably or using both but not defining the difference.

*A Dictionary of Modern Legal Usage* 343 (2d ed. 1995).

argument supports the opposite conclusion than that which Lamar reaches. Its actions coupled with the terms of the new lease indicate that the 2009 lease constituted a novation.

[¶10.]    Jermar cites to the analogous case of *Powell v. Norman Electric Galaxy, Inc.*, in support of their position that the second lease is clearly a novation of the first. 493 S.E.2d 205 (Ga. Ct. App. 1997). Similarly in *Powell*, a second lease for billboards was executed despite an automatic extension term in an original lease. The court explained that "if the parties had intended the first lease to continue, no action on their part was necessary." *Id.* at 208. Therefore, "[t]he very fact that a new lease was executed shows that a substitution ending the old lease was intended[.]" *Id.* Under South Dakota law, execution of a second contract is not dispositive in determining intent. *See Haggar*, 387 N.W.2d at 50. However, as in the *Powell* case, the fact that these parties took action where none was required under the old lease is a circumstance surrounding its creation that is properly considered when determining whether a novation has occurred.

[¶11.]    In light of the terms of the 2009 lease and the circumstances surrounding it, we cannot say that the circuit court clearly erred when it found that a novation occurred. Therefore, we affirm.

[¶12.]    GILBERTSON, Chief Justice, and ZINTER, WILBUR, and KERN, Justices, concur.